IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION



FILED
IN OPEN COURT

SEP 1 7 2019

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

KELLEY ROGERS,

Defendant.

Case No. 19-CR-270 (LO)

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### **GENERAL ALLEGATIONS**

At all times material to this Information:

1.     The defendant, KELLEY ROGERS, was President of Strategic Campaign Group, a political consulting company located in Arlington, Virginia.   ROGERS served as a consultant to, and operated, Conservative StrikeForce, a Political Action Committee (PAC).   In that role, ROGERS engaged vendors to send e-mail solicitations for donations on behalf of Conservative StrikeForce.   ROGERS approved the text of such solicitations and determined how contributions given in response to the solicitations would be spent by Conservative StrikeForce.   ROGERS also received money from Conservative StrikeForce in the form of payments to Strategic Campaign Group.

2.     Conservative StrikeForce was a Political Action Committee that purported to "organize, motivate and mobilize the conservative voters of America to help elect and support candidates" who shared Conservative StrikeForce's values.   In each of the solicitations that Conservative StrikeForce sent to potential donors during the period from July 2013 through

1

December 2013, Conservative StrikeForce represented that "[a]ll contributions will be used by Strike Force for direct candidate contributions, independent expenditures and Get Out The Vote activities in strict compliance with any and all campaign finance laws."   Conservative StrikeForce collected donations from individuals through e-mails, the U.S. mail, and telephone calls.

3.      Person A was the Chairman of Conservative StrikeForce, and in that role, consulted with ROGERS about Conservative StrikeForce's finances and how to spend the money that Conservative StrikeForce had collected from donors in response to solicitations.   All of the solicitations that Conservative StrikeForce sent via e-mail bore Person A's name as Chairman. Person A received approximately $2,500 a month from Conservative StrikeForce.

4.      Person B was the Treasurer of Conservative StrikeForce and the owner of a political consulting company based in Arlington, Virginia.   Person B worked closely with ROGERS regarding Conservative StrikeForce's finances and filed disclosures with the Federal Election Commission on Conservative StrikeForce's behalf.   Person B received compensation from Conservative StrikeForce.

5.      Person C was the Vice President of Strategic Campaign Group, and worked closely with ROGERS, including in managing and directing the operations of Conservative StrikeForce.

6.      Person D was an employee and representative of Company A.

7.      Person E was an owner and representative of Company A.

8.      Person F was the campaign manager for Candidate B.

9.      Candidate A was a candidate running for Governor of Virginia in 2013.

10.     Candidate B was a candidate running for Attorney General of Virginia in 2013.

2

11.     "Company A" was a digital political fundraising agency located in Leesburg, Virginia. It was a vendor of e-mail services for Conservative StrikeForce. As such, Company A's employees and agents commissioned draft solicitations for approval by ROGERS and consulted with ROGERS about the lists of potential donors to which the solicitations should be sent. With ROGERS' approval, Company A sent Conservative StrikeForce's solicitation e-mails to lists of potential donors and collected contributions in response to the solicitations. Company A's employees provided ROGERS with real-time information about the amount of funds collected in response to solicitations, and consulted on the fundraising strategies to be employed by Conservative StrikeForce.

12.     Company A charged Conservative StrikeForce a fee to draft the text of the solicitations that ROGERS ultimately approved for sending, and for Conservative StrikeForce to rent proprietary lists of potential donors to whom Conservative StrikeForce could send solicitations. Company A also maintained Conservative StrikeForce's "house file," a list of individuals, including contact information such as email addresses, who had previously donated to Conservative StrikeForce. If a donor on a list that Conservative StrikeForce rented contributed in response to a solicitation, that donor's name and information was then added to Conservative StrikeForce's house file.

13.     "Prospecting" is a term in the fundraising industry for the practice of sending solicitations to a rented list of potential donors for the purpose of identifying donors to be added to one's house file. Prospecting is often significantly more expensive than soliciting donations from donors already listed on one's house file, and therefore it is less likely that prospecting will

3

produce net revenue that could be used to support the goals of a fundraising campaign.   The primary purpose of prospecting is to identify new donors to solicit in future fundraising endeavors.

## COUNT ONE
### Wire Fraud Scheme
### (Violation of 18 U.S.C. § 1343)

14.     The introductory allegations set forth in paragraphs 1 through 13 are realleged and incorporated by reference as though fully set forth herein.

### The Scheme to Defraud

15.     From in or about August 2012 through in or about December 2013, in the Eastern District of Virginia and elsewhere, the defendant,

### KELLEY ROGERS,

did knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money by means of material false and fraudulent pretenses, representations, and promises; specifically, ROGERS solicited contributions for Conservative StrikeForce based on explicit misrepresentations that the money raised would be used to support get-out-the-vote and election integrity protection efforts in support of Candidate A and Candidate B, then-candidates for Governor and Attorney General of Virginia, respectively, when in reality ROGERS did not intend to, and did not, use the contributions for these purposes and instead transferred much of the money to himself or spent the money on vendors for the purpose of generating additional contributions and increasing the size of his PAC's house file.

### Purposes of the Scheme

16.     It was a purpose of the scheme for ROGERS and others to enrich themselves, through the money raised by Conservative StrikeForce, which in turn made regular payments to

Strategic Campaign Group, ROGERS' and Person C's source of employment, as well as to Person A and Person B.

17.     It was further a purpose of the scheme to capitalize on donors' sincerely held political views to induce their contributions in support of Candidate A and Candidate B, and then to instead use the funds raised to build Conservative StrikeForce's proprietary house list so that the list could be used to send additional solicitations to likely donors and collect more contributions to benefit Conservative StrikeForce, ROGERS, and others.

18.     It was further a purpose of the scheme to hide, conceal, and cover up its nature and scope by representing to Company A that funds were being used for the purposes stated in the solicitations, and by giving a small fraction of the funds raised directly to the campaigns of Candidates A and B.

## Manner and Means

19.     The scheme was carried out through the following manner and means, among others:

      a.  ROGERS approved solicitations, bearing Person A's name, that contained material misrepresentations about how Conservative StrikeForce would use donors' contributions, and directed Company A to send the solicitations by e-mail to lists of potential donors.   When the solicitations garnered net revenue, rather than spend those funds in the ways promised in the solicitations, ROGERS directed that the funds be used to send additional solicitations to prospective donors and build CSF's proprietary house list.

      b.  During the course of this scheme, donations that were sent in response to these

solicitations were held in an escrow account.  Company A and Conservative StrikeForce jointly controlled the escrow account and decided together how to disburse the funds from the escrow account; i.e., they determined whether the funds would be sent to Company A to cover fundraising and prospecting expenses, or to Conservative StrikeForce.

c.   ROGERS suggested to Company A that CSF was spending funds in the way claimed in the solicitations.

d.   ROGERS spent a small fraction of the contributions raised on a single, direct contribution to each campaign so as to avoid detection.  ROGERS contributed to Candidate B only after that campaign discovered that ROGERS' solicitations used Candidate B's likeness and the campaign put pressure on ROGERS to contribute.

### Acts in Furtherance of the Scheme

20.    In furtherance of the scheme, and to effect its objects and purposes, the defendant, ROGERS, and others committed the following acts, among others, in the Eastern District of Virginia, and elsewhere:

The Candidate A Solicitations

21.    Beginning on or about July 18, 2013, at ROGERS' direction, Conservative StrikeForce began a campaign of e-mail solicitations sent out through Company A and purporting to raise money to benefit Candidate A's campaign for Governor, ultimately sending dozens of unique messages.  Most of the messages made representations to recipients about specific ways their contributions would be used to benefit the Candidate A campaign, and all of the messages

6

included the following statement: "All contributions will be used by StrikeForce for direct candidate contributions, independent expenditures and Get Out the Vote activities in strict compliance with any and all campaign finance laws."

22.     On or about July 30, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "[Candidate A] is in real trouble." The solicitation stated, "We MUST come to [Candidate A]'s aid if he's going to stand a chance in this race…We must pay for phone banks, get-out-the-vote programs, mailings, rallies – whatever it takes."

23.     On or about September 17, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "[Candidate A]'s fate is in your hands." The solicitation announced the creation of a "Virginia Victory Money Bomb" with a goal of raising $50,000 by October 1st.

24.     As of September 25, 2013, Conservative StrikeForce had already raised hundreds of thousands of dollars through its Candidate A solicitations, it had over $45,000 in its escrow account, and it had distributed more than $150,000 of the money raised to Company A for the purpose of growing Conservative StrikeForce's house list.

25.     Nevertheless, on or about September 25, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "$25,239 Short with Only 5 Days to Go." The solicitation claimed that the Money Bomb was falling short of its goal, and that "We must pay for phone banks, get-out-the-vote programs, mailings and rallies that will propel [Candidate A] to victory."

7

26.     On or about October 8, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "[Candidate A] is now tied!"  It continued, "We are putting together one of the largest GOTV efforts in Virginia history...Now all we need is to pay for the massive phone banks, the absentee ballot campaigns, and the massive 'knock and drag' effort that will win this."

27.     On or about October 21, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "Help [Candidate A]'s GOTV," and said, "[Candidate A] needs a massive get-out-the-vote effort to make sure every single conservative gets to the polls.  He needs phone banks.  Election Day drivers and poll workers.  Donate what you can today.  Please, this is very important."

28.     On or about October 25, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors representing that "We have drafted the largest GOTV plan in Virginia history.  Now all we need is to pay for the massive phone banks, the absentee ballot campaigns, and the massive door-to-door effort that will win this."

29.     On or about October 28, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the same representation that "We have drafted the largest GOTV plan in Virginia history ..." and also falsely stating that "Conservative StrikeForce has already contributed *over $10,000* to [Candidate A]'s campaign."

30.     On or about November 1, 2013, with ROGERS'S approval and at his direction, Company A sent an e-mail solicitation to potential donors representing that "[Candidate A] still needs help with his conservative turnout operation, and we need to pay for attorneys to fight ballot

8

fraud across Virginia." This solicitation further stated, "That's why it is so important that we raise the necessary funds for GOTV and Election Day lawyers."

31.    On or about November 4, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "[Candidate A] is in a one-point race," requesting "an urgent contribution...to our emergency Virginia GOTV and election security effort NOW." It continued, "[Candidate A] still needs help with his conservative turnout operation in the final 24 hours of this campaign, and we need to pay for attorneys to fight ballot fraud across Virginia. But things are looking good *if* we can just raise the last-minute funds to pay for these projects.... That's why it is so important that we raise the necessary funds for GOTV and Election Day lawyers.... Your gift right now will be instantly processed and sent directly to the front lines of this last-change get-out-the-vote effort."

32.    On or about November 4, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "They are trying to steal this election from [Candidate A]." It stated, "We need to hire dozens of lawyers for Election Day and we need to do it now! Please make the very best donation you can. This is urgent." It further stated, "We need to hire election lawyers for what promises to be a very long day."

33.    On or about November 5, 2013, which was Election Day, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "Don't let the liberals steal Virginia." It claimed, despite having already raised hundreds of thousands of dollars and having in excess of $65,000 still in its escrow account, "We still need to raise $9,857 to pay for the legal teams [Candidate A] needs to stop any Democratic fraud in its

9

tracks." It further claimed, "Mark my words, if we don't have lawyers ready to fight the Democrats' voter fraud efforts, Barack Obama's Democrats *WILL* steal this election.... We need our lawyers on the ground! Please donate what you can right away."

34. On or about November 6, 2013, the day after the election, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "Thank you!" It stated that with donors help, Conservative StrikeForce was able "to give $15,000 directly to [Candidate A]'s campaign and invest tens of thousands more in get-out-the-vote work on his behalf." In truth and in fact, Conservative StrikeForce gave only $10,000 to Candidate A's campaign, and did not invest any money in get-out-the-vote work on Candidate A's behalf.

35. If a donor clicked on one of these email solicitations in order to donate, that donor was brought to a webpage where the donor could enter his/her personal and payment information, including the donation amount. On that page, donors were told that "All money raised by Conservative StrikeForce's [Candidate A] Fund will be spent on behalf of [Candidate A] or given as a direct contribution."

The Candidate B Solicitations

36. Beginning on or about November 7, 2013, at ROGERS' direction, Conservative StrikeForce began a campaign of e-mail solicitations sent out through Company A and purporting to raise money to benefit Candidate B, a candidate for Attorney General of Virginia. The Attorney General election was so close that it required a recount, and therefore Candidate B's campaign continued. All of Conservative StrikeForce's solicitations relating to the Candidate B campaign included the following statement: "All contributions will be used by StrikeForce for

10

direct candidate contributions, independent expenditures and Get Out the Vote activities in strict compliance with any and all campaign finance laws."

37.    On or about November 7, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "Don't let the liberals sweep Virginia." It asked for contributions to "Conservative StrikeForce's Emergency Ballot Security initiative." It stated, "We must keep our legal team on the ground to monitor this recount process and prosecute the voter fraud activity that is sure to take place." It also represented that Conservative StrikeForce had a "legal team...ready to take any necessary action to defend the integrity of this election.  But with each passing day, our legal bills are piling up."

38.    On or about November 14, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors stating, "The liberals are magically 'finding' votes, counting provisional ballots from people who may not even have been registered, and pulling out every dirty trick in their voter fraud playbook.  We have to stop them. We must continue paying for the best voter fraud attorneys money can buy....  We have already invested several thousand dollars in the legal effort to protect this Republican victory.  But with each passing day, the legal bills are continuing to pile up." It further stated, "Our treasury is, quite honestly, *depleted* after months and months of campaigning on behalf of [Candidate A]."

39.    On or about November 29, 2013, with ROGERS'S approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "The Liberals Just Stole this Election from [Candidate B]." It said, among other things, that Conservative StrikeForce "must continue paying for the best voter fraud attorneys money can buy."

///

11

ROGERS' Direction to Company A

40.     While ROGERS was approving and directing these solicitations claiming that contributions made in response would benefit Candidate A and Candidate B, ROGERS was directing Company A to instead use the net proceeds from the solicitations to send further solicitations to additional potential donors and to grow Conservative StrikeForce's house list in order to raise even more money for Conservative StrikeForce in the future.  ROGERS did not spend any money raised on get-out-the-vote efforts or independent expenditures in support of the campaigns of Candidates A or B, and made only a single contribution to the campaigns of Candidate A and Candidate B.

41.     On or about March 25, 2013, Person B sent an email to ROGERS stating, "The mailings have been dismal ... and here are my reasons based on comments received: 1. Our donor base is old and dying; 2. Some are so disappointed in Obama's victory that they have given up; 3. Many claim that they no longer can afford to give; and 4. Although unstated, people don't see the urgency."  The email further stated, "We need to give our donors a reason to give, and it's not Chris Christie and certainly not [Candidate A] ...."

42.     From on or about March 25, 2013, through and beyond June 27, 2013, ROGERS, Person B, Person C, Person D, Person E, and others considered topics in the news that Conservative StrikeForce could use to inspire donors to contribute money to the PAC.  For example, in email communications, ROGERS and others considered the Benghazi attacks, immigration reform, and an alleged incident involving the IRS as possible topics to use to solicit donations from conservative donors.

43.     On or about June 27, 2013, Person E, a representative of Company A emailed ROGERS to state his concern that "the list is growing stale.  Right now, our goal should be to grow the list as fast as possible so that this time next year we can begin generating massive amounts of net revenue for StrikeForce to spend."   Person E further advised, "We have found that the best way for us to run a program like this is for the client to commit upfront to investing a set percentage of their house file net revenue into an ongoing acquisition program.  This way, the program is completely no risk to you, and we know exactly how much money we have to spend on a monthly basis.  The more successful the program becomes, the more money we have to spend and the faster your list grows."   Person E recommended investing 75% of net revenue into the prospecting program.

44.     On or about June 27, 2013, ROGERS replied to Person E saying, "This is perfect. I think it is great and it is a go.  Let's roll."

45.     On or about June 28, 2013, ROGERS emailed Person B, Person C, Person E, and an accountant at Company A, with a plan to "refresh and rebuild our list for next year...." ROGERS directed that beginning on July 1, 2013, "we are going to use 100% of all net revenue that comes in for list building" and that "we just need to make sure we send all monies generated through the email program to [Person E] through at least May 2014 at which time we'll reevaluate."   ROGERS wrote that the "only exception to this may be Oct. of 2013 where we may need to use 25% of net just for that month because of the VA elections but I'll get back to everyone on that as we get closer to that day."

46.     ROGERS and others then began to solicit donations heavily using Candidate A's campaign for Governor as its main vehicle.  Indeed, on or about July 15, 2013, Person D, a

representative of Company A, emailed ROGERS with a draft of an upcoming solicitation for ROGERS'S review and approval. In the email, Person D states, "[Candidate A] has been by far our best perform over the past few weeks, so I'd advise going back to him."

47.     On or about July 24, 2013, Person D sent ROGERS, Person C, and Person E an email with the subject line "StrikeForce Prospecting." Person D reported that between July 1 and July 24, 2013, the house file had "netted $11,855" and that consistent with ROGERS'S direction, Company A had "taken that net from the house file and plowed it into list rentals." Person D wrote that "All of this has been done on our [Candidate A] campaign, so one thing's for sure – people love [Candidate A]." He concluded the email by writing that "the plan is to continue putting [Candidate A] front and center until people just don't want to hear about him anymore. And at this rate, we're still bringing in money faster than we can spend it...So the plan is to keep on churning, keep building this file, and keep staying in the black!" ROGERS responded, "[T]his is awesome. We are very happy. Let's roll."

48.     On or about July 26, 2013, Person E sent ROGERS and Person D an email with the subject line "Email Recommendation." Person E stated, "I'm a little concerned that we are mailing a lot and drawing a lot of attention to StrikeForce. I think it would be a good investment to cut either a radio ad or a TV ad in support of [Candidate A]. I have guys who can handle that if you want. If you have a team, that[']s perfect. An ad like that would be great for fundraising too. People love to vive and get an ad on air. Let me know what you think." Despite this email and the hundreds of thousands of dollars raised on the solicitations using Candidate A's race for Governor, Conservative StrikeForce and ROGERS did not spend any money on any radio, TV, or any other ads.

14

49.     On or about August 1, 2013, Person D sent ROGERS an email in which he reported that "[t]his was a banner month for StrikeForce." Person D also stated, "This is really awesome stuff for the middle of the summer in an off-year. The VA governor's race has been a HUGE help to the [prospecting] program." He continued, "All in all, we can't say enough good things about this [prospecting] program. We're planning to keep on rolling with [Candidate A] until the results really start to drop off. But until then, let's keep on growing! ROGERS replied, "Awesome!"

50.     On or about August 8, 2013, Person D again updated ROGERS. "Since we began aggressively building the list on July 1, we have spent $88,831. We have raised $95,576, putting us at about $7k in the black overall." ROGERS wrote back, "Awesome!"

51.     The "Money Bomb" that ROGERS and Company A planned for September 2013 was also a successful fundraising vehicle. On September 25, 2013, Person D wrote to ROGERS, "Overall, we're on course to raise about $18,000 and net about $13k more, give or take, which should put us somewhere in the neighborhood of $25,000 net for the money bomb from start to finish." ROGERS responded, "Man, that is sic. Great job!"

52.     On or about October 1, 2013, ROGERS emailed Person D to discuss the solicitation campaign, reporting that Person A "is under tremendous pressure from all of his friends for us to do more for [Candidate A]." ROGERS continued, "I want to do all we can but I do not want to harm our prospecting plan. Let's talk about what we can do without disadvantage (sic) our program when you get a chance."

53.     On or about October 4, 2013, Conservative StrikeForce made a single, $10,000 direct contribution for Candidate A for Governor. On the same day, Company A directed the

transfer of $17,394.00 to Conservative StrikeForce's operating account from the escrow account in which the donations were kept.

54.    On or about October 7, 2013, ROGERS emailed Person D to determine how much money Conservative StrikeForce had available to it, ostensibly to support Candidate A, but again emphasized his priority, writing, "I do not want to hurt our prospecting long term plan as you know."  Person D responded that $10,000 was a safe estimate of net funds that ROGERS could expect if ROGERS wanted to spend money in support of Candidate A.  Person D continued, "Unfortunately, to get there, we are going to have to slow down prospecting a bit...but the file has already grown significantly this summer, and we definitely expect it to continue to grow next year."  ROGERS replied, "I may be able to get enough out of the mail.  I just hate to slow our prospecting down in any way."

55.    On or about October 8, 2013, there was approximately $44,286.77 in the escrow maintained by Conservative StrikeForce and Company A.

56.    On or about October 10, 2013, Person E emailed ROGERS, Person C, Person D, and an accountant at Company A, writing, "Taking into account upcoming transfers from the merchant account and outstanding [Company A] invoices, the StrikeForce escrow account is roughly $15,500 in the black!"  He then proposed paying an outstanding $5,000 invoice and suggested options for spending the remaining $10,500:  "We can do one of three things: a) Transfer the balance to StrikeForce's operating account for candidate donations and IE expenses, b) Reinvest the $10k in prospecting to continue building the email list, c) Launch an online independent expenditure support [Candidate A]."

16

57. ROGERS, however, rather than use any of this $10,500 net for Candidate A, directed Company A to spend the funds on further solicitations and list-building, writing, "It seems to me that we have done so well with this that we should reinvest all of it right now, try to grow the list, try to build the house file where we can be in a position to transfer more into the GOTV on or around the 25th of October...That said, I want to grow this list and it seems to me as the market is getting hot (and it will get much hotter in the next 3 weeks) we should pound away, build the file and use the housefile to generate some extra money for [GOTV]."

58. On or about October 18, 2013, ROGERS agreed with Company A to continue to prospect, stating, "I really want to keep prospecting strong while we are getting good results." He asked Person D for an estimate of funding available, given this plan, for Conservative StrikeForce to use in support of Candidate A. Person D responded, "10,000 no problem, and $15,000 is possible as well, if you need that much."

59. On or about October 31, 2013, Company A directed the transfer of $35,000 to Conservative StrikeForce's operating account from the escrow account in which the receipts from the solicitations were kept.

60. On or about November 7, 2013, Person F, campaign manager for Candidate B, wrote an email to ROGERS asking Conservative StrikeForce to stop soliciting contributions using Candidate B's name, or to contribute the receipts from the solicitations to Candidate B. ROGERS forwarded the email to Person E, who responded, "We have cash if you want to donate. I'm sure he could use it. $5k maybe." ROGERS responded that ROGERS' attorney had indicated that "we need to give a major portion of the proceeds to the recount fund. That said I want to cover all costs and bank something off of this too." Person E wrote, "Well, we haven't netted a ton

17

from [Candidate B] emails. I think $5k is a nice number. More than we have netted but we can afford it." ROGERS replied, "Let's send an odd number like 4755 or something so it looks like we have contributed what came in."

61.     On or about November 8, 2013, Company A directed the transfer of $4,750 to Conservative StrikeForce's operating account from the escrow account in which the receipts from the solicitations were kept.

62.     On or about November 8, 2013, ROGERS responded to Person F, writing, "As it relates to our solicitation, yes we are going to help. Whether that is providing our attorney for in kind services or making a direct cash contribution I'll make that determination next week once the receipts are reconciled."

63.     On or about November 13, 2013, Conservative StrikeForce made a single, direct contribution for $3,000 to Candidate B for Attorney General.

64.     Between on or about August 6, 2013, and November 19, 2013, ROGERS approved the following financial distributions to Company A to support the prospecting program:

| 8/6/13: | $22,500.00 | 10/1/13: | $6,000.00 |
|---|---|---|---|
| 8/15/13: | $24,290.00 | 10/8/13: | $22,640.00 |
| 8/20/13: | $38,449.00 | 10/16/13: | $4,999.60 |
| 8/28/13: | $14,366.00 | 10/22/13: | $31,741.00 |
| 9/11/13: | $17,039.00 | 11/5/13: | $37,918.00 |
| 9/18/13: | $24,955.00 | 11/12/13: | $27,510.00 |
| 9/24/13: | $6,045.00 | 11/19/13: | $34,071.00 |
| | | *Total (8/6-11/19): $312,523.00* | |
| | | *Total (entire scheme): $341,600* | |

65.     In total, in response to solicitations representing that "all contributions" would assist Candidate A for purposes such as getting out the vote and election integrity protection, Conservative StrikeForce collected more than $400,000. In its filings to the Federal Election Commission, Conservative StrikeForce reported only a single $10,000 donation on October 4, 2013, to Candidate A for Governor.

66.     In total, in response to solicitations representing that "all contributions" would assist Candidate B, for purposes such as legal assistance during the recount, Conservative StrikeForce collected more than $13,000. In its filings to the Federal Election Commission, Conservative StrikeForce reported only a single $3,000 donation on October 13, 2013, to Candidate B for Attorney General.

## Execution of the Scheme

67.     On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, the defendant, ROGERS, for the purpose of executing and attempting to execute the scheme and artifice to defraud, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, knowingly transmitted, caused to be transmitted, and aided and abetted the transmission of, the following writings, signs, signals, pictures, and sounds, by means of wire communication in interstate commerce:

///

///

///

///

///

19

| Count | Approximate Date | Description of Wire Communication |
|-------|------------------|-----------------------------------|
| 1 | November 4, 2013 | A wire, that is, an email sent with ROGERS'S approval and at his direction to potential donors with the subject line "[Candidate A] is in a one-point race," requesting "an urgent contribution…to our emergency Virginia GOTV and election security effort NOW."   The email continued, "[Candidate A] still needs help with his conservative turnout operation in the final 24 hours of this campaign, and we need to pay for attorneys to fight ballot fraud across Virginia. But things are looking good *if* we can just raise the last-minute funds to pay for these projects….   That's why it is so important that we raise the necessary funds for GOTV and Election Day lawyers….   Your gift right now will be instantly processed and sent directly to the front lines of this last-chance get-out-the-vote effort." |

All in violation of Title 18, United States Code, Section 1343.

20

## FORFEITURE NOTICE

68.     Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendant, ROGERS, that if convicted of the violation alleged in this Information, any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (wire fraud) shall be subject to forfeiture to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2.

69.     Defendant is notified that upon conviction, a money judgment in the amount of **at least $208,954.00**, which represents the proceeds obtained from the wire fraud offense, may be imposed.

70.     Defendant is notified that if any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant up to the total value of the property subject to forfeiture pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:     _Kimberly R. Pedersen_

          Kimberly R. Pedersen
          Assistant United States Attorney

          AnnLou Tirol
          Acting Chief
          Public Integrity Section

By:     _____

          William J. Gullotta
          John P. Taddei
          Trial Attorneys