IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 19-CR-270 (LO)

KELLEY ROGERS,

        Defendant.

FILED
IN OPEN COURT

SEP 1 7 2019

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## STATEMENT OF FACTS

The United States and the defendant, KELLEY ROGERS (hereinafter, ROGERS or "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1.    From in or about August 2012 through in or about November 2014, in the Eastern District of Virginia and elsewhere, the defendant knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises. Specifically, the defendant was President of Strategic Campaign Group, a political consulting company located in Arlington, Virginia, in the Eastern District of Virginia. The defendant also operated multiple political action committees ("PACs"), including Conservative StrikeForce ("CSF"), Conservative Majority Fund, and Tea Party Majority Fund (collectively, "ROGERS' PACs"). In that role, the defendant engaged vendors to send e-mail solicitations to prospective donors seeking political contributions on behalf of CSF. ROGERS approved the text and other content of all solicitations, and determined how CSF spent the contributions individual donors gave in response to the solicitations.

2.    "House file" is a term in the fundraising industry that refers to a proprietary list of donors or potential donors. PACs often maintain a house file and use that list to solicit funding.

3.     "Prospecting" is a practice used in fundraising to increase the number of potential donors on an entity's house file by renting donor lists owned by other entities and soliciting donations from the donors on those rented lists, typically involving a broker or other intermediary between the renter and owner of the list.  As relevant here, once a person on a rented list contributed a donation to CSF (or responded in some other way), that donor's name would be added to CSF's house file.  Prospecting is generally considered to be expensive because the cost of renting lists is high and often exceeds the value of donations received in response to solicitations sent to rented lists.  Fundraising groups that prospect commonly do not expect to turn a profit from that endeavor.  However, ROGERS believed that the addition of new donors to CSF's house list had long-term value that justified the expense of prospecting because those new donors would be more likely to contribute again in the future.

4.     During the course of the scheme, the defendant solicited contributions from the general public for ROGERS' PACs based on materially false and fraudulent pretenses, representations, and promises, namely: in or around 2013, that the money contributed by donors would be used to support the campaigns of Candidate A for Governor and Candidate B for Attorney General of Virginia (the "Campaigns") through get-out-the-vote efforts and hiring attorneys to ensure the integrity of the elections; and in or around 2014, that donations would be spent on assistance and support to military veterans.  In truth and in fact, the defendant never intended to spend, and never actually spent, any of the money raised by ROGERS' PACs on get-out-the-vote efforts or lawyers to protect the integrity of the 2013 Virginia and Attorney General elections, or on assistance and support for military veterans.

5.     In 2013, the defendant knowingly misrepresented that, among other things, (1) all contributions to CSF would be spent on direct contributions, independent expenditures, or "get out

2

the vote" activities in support of the Campaigns; (2) "all money raised by Conservative StrikeForce's [Candidate A] Fund will be spent on behalf of [Candidate A] or given as a direct contribution"; (3) donations would be spent on implementing "the largest [get out the vote] plan in the history of Virginia"; and (4) donations would be spent on attorneys to support the Campaigns. In 2014, the defendant knowingly misrepresented that donations to CSF would be spent on efforts to support military veterans suffering from brain trauma and other physical disabilities.

6.      In reality, the defendant never intended to, and did not, use all contributions from donors for these purposes and instead spent nearly all of the money raised from donors to benefit ROGERS' PACs, primarily by prospecting to increase the size of the CSF house file in order to solicit more money from donors in the future. The defendant also spent the net contributions on payments to himself and his associates. Moreover, none of the money raised was spent on get-out-the-vote efforts or attorneys to support the Campaigns. Indeed, in 2013, ROGERS raised approximately $432,700 from donors by misrepresenting that the money would be spent on, among other things, get-out-the-vote efforts and lawyers to protect the elections involving the Campaigns. In truth and in fact, CSF spent only $10,000 on a single contribution to the Candidate A campaign and $3,000 on a single contribution to the Candidate B campaign (combined, approximately 3% of the money raised) and never intended to spend any money on get-out-the-vote efforts or lawyers to protect the elections. Meanwhile, CSF spent more than $350,000 of donor money on its effort to solicit more money from donors and increase the size of its proprietary house file. In 2014, CSF raised approximately $45,155 from donors by misrepresenting that the money would be spent on assistance and support for military veterans suffering from brain trauma and other injuries related to their service. In reality, the defendant never intended to, and did not, spend any money

3

on causes to support veterans, and instead spent approximately $39,332 on prospecting to increase the size of its house file.   Notably, the defendant directed approximately $4,512 to CSF's coffers instead of using that money to support veterans.

7.     In order to execute the defendant's scheme to defraud donors, the defendant hired a digital fundraising service provider (Company A).  Company A worked with the defendant to create fundraising campaigns that would provide an income stream to the defendant's PACs and Company A.  In furtherance of that effort, Company A created emails on behalf of ROGERS' PACs and, following review and approval by the defendant, sent the emails to potential donors to persuade them to contribute to ROGERS' PACs.

8.     For example, in 2013, Company A and the defendant searched popular issues in the news to identify causes or campaigns that might inspire politically conservative persons to donate money to CSF.  They considered highlighting topics including, but not limited to: gun control; criticizing then-Senator Harry Reid for failing to pass a budget; former Maricopa County, Arizona Sheriff Joe Arpaio; illegal immigration; reports that the IRS targeted conservative groups for increased scrutiny; the 2012 attacks in Benghazi; and the then-upcoming 2013 elections in Virginia, including Candidate A's campaign for Governor.  Company A created multiple email solicitations referencing some of these issues.  The defendant reviewed and approved the solicitations and directed Company A to send them to potential donors on lists owned and/or maintained by ROGERS' PACs.

9.     During the first half of 2013, ROGERS, Person B, Person C, and Company A were disappointed with the amount of money raised by these emailed fundraising solicitations.  By June 2013, Company A and the defendant grew concerned that CSF's house list had grown "stale," and therefore they needed to find new potential donors to add to CSF's list.  Company A and the

4

defendant decided that their goal should be to grow CSF's house list as much as possible so that, by June 2014 (seven months after the conclusion of the 2013 elections in Virginia), CSF would be in a position to generate a much higher amount of revenue for the PAC.

10.     By on or about June 28, 2013, in order to grow CSF's house list for 2014, Company A and the defendant agreed to reinvest 100% of the net revenue generated from all of the email solicitations sent on behalf of CSF into a prospecting effort.   In other words, ROGERS intended to spend all of the money raised through donations to the PAC on prospecting.   ROGERS did not intend to spend any of the money on the causes that were the subjects of the solicitations.

11.     Because Company A and the defendant agreed to reinvest 100% of CSF's revenue into prospecting until the middle of 2014, there necessarily would be no money left over to contribute to the causes referenced in the emailed fundraising solicitations.

12.     By July 2013, the defendant began a concerted effort to solicit money from donors by falsely stating that the defendant and his PAC, CSF, intended to spend money raised through donations on actions to support the Campaigns, including, but not limited to, get-out-the-vote efforts and hiring attorneys.   This effort continued on a consistent basis beyond the end of November 2013, when the Attorney General recount concluded.   Examples of ROGERS' misrepresentations and false statements include:

**Solicitations Regarding the Candidate A Campaign**

a. On or about July 30, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "[Candidate A] is in real trouble."   The solicitation stated, "We MUST come to [Candidate A]'s aid if he's going to stand a chance in this race…We must pay for phone banks, get-out-the-vote programs, mailings, rallies – whatever it takes."

5

b. On or about September 25, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "$25,239 Short with Only 5 Days to Go." The solicitation claimed that the Money Bomb was falling short of its goal, and that "We must pay for phone banks, get-out-the-vote programs, mailings and rallies that will propel [Candidate A] to victory."

c. On or about October 8, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "[Candidate A] is now tied!" It continued, "We are putting together one of the largest GOTV efforts in Virginia history...Now all we need is to pay for the massive phone banks, the absentee ballot campaigns, and the massive 'knock and drag' effort that will win this."

d. On or about October 21, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "Help [Candidate A]'s GOTV," and said, "[Candidate A] needs a massive get-out-the-vote effort to make sure every single conservative gets to the polls. He needs phone banks. Election Day drivers and poll workers. Donate what you can today. Please, this is very important."

e. On or about October 25, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors stating, "We have drafted the largest GOTV plan in Virginia history. Now all we need is to pay for the massive phone banks, the absentee ballot campaigns, and the massive door-to-door effort that will win this."

f. On or about October 28, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors stating, "We have drafted the

largest GOTV plan in Virginia history ...." That solicitation also falsely stated, "Conservative StrikeForce has already contributed *over $10,000* to [Candidate A]'s campaign."

g. On or about November 1, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors stating, "[Candidate A] still needs help with his conservative turnout operation, and we need to pay for attorneys to fight ballot fraud across Virginia." This solicitation further stated, "That's why it is so important that we raise the necessary funds for GOTV and Election Day lawyers."

h. On or about November 4, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "[Candidate A] is in a one-point race," requesting "an urgent contribution...to our emergency Virginia GOTV and election security effort NOW." It continued, "[Candidate A] still needs help with his conservative turnout operation in the final 24 hours of this campaign, and we need to pay for attorneys to fight ballot fraud across Virginia. But things are looking good *if* we can just raise the last-minute funds to pay for these projects.... That's why it is so important that we raise the necessary funds for GOTV and Election Day lawyers.... Your gift right now will be instantly processed and sent directly to the front lines of this last-change get-out-the-vote effort."

i. On or about November 4, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "They are trying to steal this election from [Candidate A]." It stated, "We need to hire dozens of lawyers for Election Day and we need to do it now! Please make the very best donation

7

you can. This is urgent." It further stated, "We need to hire election lawyers for what promises to be a very long day."

j.   On or about November 5, 2013, which was Election Day, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "Don't let the liberals steal Virginia." It claimed, despite the fact that CSF had already raised hundreds of thousands of dollars and had more than $65,000 in its escrow account at the time, "We still need to raise $9,857 to pay for the legal teams [Candidate A] needs to stop any Democratic fraud in its tracks." The solicitation further claimed, "Mark my words, if we don't have lawyers ready to fight the Democrats' voter fraud efforts, Barack Obama's Democrats *WILL* steal this election.... We need our lawyers on the ground! Please donate what you can right away."

k.   On or about November 6, 2013, the day after the election, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "Thank you!" It stated that, with donors' help, Conservative StrikeForce was able "to give $15,000 directly to [Candidate A]'s campaign and invest tens of thousands more in get-out-the-vote work on his behalf."

l.   During the course of this scheme, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors stating, "Because of you, we have been able to contribute *more than $15,000.00* directly to [Candidate A]'s campaign, launch thousands of get out the vote phone calls on his behalf, and hire the best election law attorney available in case of voter fraud issues. We have done almost everything there is to do to help [Candidate A]."

8

m. On the webpage where donors provided their personal and payment information to donate, the defendant represented that "All money raised by Conservative StrikeForce's [Candidate A] Fund will be spent on behalf of [Candidate A] or given as a direct contribution."

***Solicitations Regarding The Candidate B Campaign***

n. On or about November 7, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors with the subject line, "Don't let the liberals sweep Virginia." It asked for contributions to "Conservative StrikeForce's Emergency Ballot Security initiative." It stated, "We must keep our legal team on the ground to monitor this recount process and prosecute the voter fraud activity that is sure to take place." It also stated that Conservative StrikeForce had a "legal team...ready to take any necessary action to defend the integrity of this election. But with each passing day, our legal bills are piling up."

o. On or about November 14, 2013, with ROGERS' approval and at his direction, Company A sent an e-mail solicitation to potential donors stating, "The liberals are magically 'finding' votes, counting provisional ballots from people who may not even have been registered, and pulling out every dirty trick in their voter fraud playbook. We have to stop them. We must continue paying for the best voter fraud attorneys money can buy.... We have already invested several thousand dollars in the legal effort to protect this Republican victory. But with each passing day, the legal bills are continuing to pile up." It further stated, "Our treasury is, quite honestly, *depleted* after months and months of campaigning on behalf of [Candidate A]."

13.     In truth and in fact, the defendant never intended to, and did not, spend any of the donations on any get-out-the-vote efforts (and certainly not "the largest in Virginia history"), phone banks, absentee ballot campaigns, election day drivers, poll workers, rallies, or attorneys in support of the Campaigns.

14.     In furtherance of the scheme to defraud, the defendant and Company A knowingly sent emails to potential donors within and outside the Commonwealth of Virginia in order to solicit donations using these false representations.

15.     The object and purpose of the scheme was for the defendant to enrich himself and the PACs he controlled by obtaining contributions under false pretenses from supporters of Candidate A, Candidate B, and military veterans during 2013 and 2014.

### *Solicitations Regarding Military Veterans*

16.     In or about November 2014, the defendant began another concerted effort to solicit money from donors, this time by misrepresenting that the defendant and his PAC, Conservative StrikeForce, intended to spend money raised through donations on causes and efforts to support military veterans suffering from brain trauma and other injuries related to their service.

17.     In order to execute this scheme to defraud donors, the defendant engaged Company B to make telemarketing phone calls to potential donors to solicit donations. During November 2014, Company B maintained a call center in Milwaukee, Wisconsin, from which it initiated calls nationwide to solicit donations to CSF.

18.     During these fundraising calls, with ROGERS' approval and at his direction, representatives of Company B told potential donors, "We need to ensure there are proper programs in place to help returning heroes with brain trauma to physical disabilities transition from the battlefield to the workplace. That is why it is so critical to return your generous pledge … today.

The Conservative StrikeForce is active [sic] blanketing the country with a network of messaging through social media, e-mails, Tele-Townhalls and independent expenditures. We are determined to give those returning heroes from the frontlines real solutions to real problems."

19.    In reality, the defendant did not, and never intended to, spend any of the money raised on causes or services to benefit military veterans.

20.    The defendant and Company B knowingly solicited donations from individuals throughout the United States, with the calls originating from Wisconsin.

21.    During the course of this Veterans-based fundraising campaign during the month of November 2014, donors contributed approximately $45,155. However, the defendant never intended to spend, and did not actually spend, any of the money raised on supporting military veterans.

*The Defendant Used False Billing Schemes To Misappropriate Funds From His PACs*

22.    During the course of this scheme, the defendant misappropriated hundreds of thousands of dollars from the various PACs that he controlled, including Conservative StrikeForce, Conservative Majority Fund, Tea Party Majority, and Move Maryland Forward. One way in which the defendant accomplished this scheme was to work with others in his inner circle, particularly telemarketing, email, and direct mail vendors, to cause the creation of fake invoices. While the defendant may have performed some actual work in connection with these invoices, the invoices falsely depicted services that were ostensibly (though not actually) performed by vendors or other entities for one or more of the defendant's PACs and a resulting debt owed by the PACs for those services purportedly rendered. ROGERS then caused those vendors and other entities to submit the false invoices to PACs under his control. Upon receiving the invoices that the defendant knew were false, the defendant then caused the payment of money from the PACs to

entities either under his control or under the control of others in his inner circle who would kick money back to the defendant, thereby misappropriating money that donors had contributed to his PACs.

23.     For example, Move Maryland Forward ("MMF") is a candidate committee formed in July 2016 to support the candidacy of one political candidate.   Person B is the assistant treasurer and custodian of records of MMF.   Person B signed the Statement of Organization as treasurer. During all relevant times, the defendant controlled MMF.

24.     Between August 5, 2016, and November 1, 2016, MMF raised approximately $354,000 from nine donors.   While some of the donations to MMF were spent on radio and television ads in support of the political candidate, the defendant used a false invoicing scheme to misappropriate approximately $126,350 from the PAC.

25.     Specifically, on or about October 21, 2016, and November 3, 2016, the defendant caused the creation of false invoices indicating that an entity under his control, Campaign Communications, Inc., purportedly incurred expenses for get-out-the-vote calls on behalf of MMF. The defendant then caused MMF to pay Campaign Communications, Inc., $67,700 for these purported phone calls.   In truth and in fact, Campaign Communications, Inc., did not arrange get-out-the-vote calls, and the invoices were created solely so that the defendant could misappropriate money from MMF.

26.     Additionally, between August 1, 2016, and November 30, 2016, the defendant caused two vendors to create several false invoices, and he used these false invoices to misappropriate $58,650 from MMF.   These invoices reflected expenses that the two vendors had allegedly incurred on behalf of MMF for renting donor lists.   In truth and in fact, these purported expenses were false; the vendors had not incurred these list rental expenses.   On or about August

12

17, 2016, and November 7, 2016, the defendant directed an individual ("List Broker 1") to create false invoices totaling $17,800 for list rental services purportedly incurred on behalf of MMF. As directed by the defendant, List Broker 1 created the invoices and sent them to the defendant. The defendant caused the payment of the false invoices from MMF funds to List Broker 1. In accordance with a previously established arrangement with List Broker 1, List Broker 1 sent 80% of the misappropriated funds back to the defendant. List Broker 1 kept the remaining 20% for herself, despite having performed no services for MMF.

27. During 2016 and 2017, the defendant and his co-conspirators engaged in similar false billing schemes, including those described in the preceding paragraphs, to misappropriate as much as $198,893 from the PACs that the defendant controlled.

**Excessive Contributions to Conservative Strikeforce By Payment of Legal Fees**

28. In violation of federal campaign finance laws, the defendant used several of his PACs to make excessive contributions to CSF. Beginning in March 2015 and continuing through 2018, the defendant caused Conservative Majority Fund and Tea Party Majority, which were PACs under his control, to pay approximately $249,000 to satisfy preexisting debts incurred by CSF as a result of a 2014 civil lawsuit. These payments exceeded the $5,000 annual limit on contributions to a political committee. Furthermore, the defendant knowingly and willfully caused these payments to be falsely reported to the FEC by the PACs.

29. Following the scheme involving Candidate A's 2013 campaign for Governor of Virginia, Candidate A sued the defendant and Conservative StrikeForce. Many of the claims were based on the misrepresentations made by the defendant in the solicitations sent to donors. In connection with that lawsuit, Conservative StrikeForce incurred significant legal fees. In order to pay Conservative StrikeForce's legal fees, the defendant caused money that had been

13

contributed by donors to other PACs – Conservative Majority Fund and Tea Party Majority – to be paid to Conservative StrikeForce's attorneys to cover the expenses resulting from Candidate A's lawsuit in 2014. Under federal campaign finance laws, the PACs were prohibited from contributing more than $5,000 to Conservative StrikeForce in any given year, and therefore at least $219,000 of that money constituted unlawful excessive campaign contributions.

30.     Moreover, even if the two PACs would have been able to give as much as $5,000 each to Conservative StrikeForce, the defendant and his co-conspirators knowingly and willfully failed to report these payments to the FEC as contributions to Conservative StrikeForce in order to conceal from donors and the federal government the true nature of those payments. In fact, although many of the payments were reflected in FEC filings filed on behalf of Conservative Majority Fund and Tea Party Majority, none of the filings accurately reported that the legal fees were incurred by Conservative StrikeForce (a separate PAC) and that the payment of these fees constituted a contribution to Conservative StrikeForce. Furthermore, many of the FEC filings falsely reported payments for legal fees as more typical PAC-related expenses, such as "CONSULTING-DATA PROCESSING," "EMAIL SOLICITATIONS," "PAC eMAIL FUNDRAISING" or "PAC eMAIL SOLICITATIONS."

***Conduit Contribution Scheme***

31.     In 2015, the defendant, Person G, and others orchestrated a scheme to use conduits to evade the limits placed on money that individuals could contribute to the political campaign of Candidate C, who running to represent an Indiana district in the United States House of Representatives. The purpose of this scheme was to enable Person G to transfer an amount of money to Candidate C's campaign that exceeded the applicable monetary limit on individual

14

contributions to a political campaign under federal law in a manner that disguised the fact that Person G was the true source of the funds.

32.    To execute this scheme, the defendant and others recruited at least eleven individuals ("the conduits") and persuaded them to transfer money, usually by writing checks in their own names, and in the amount of $2,700, to Candidate C.  The defendant and others also served as conduits by transferring $2,700 to Candidate C.   At the time, $2,700 was the maximum allowable contribution from an individual to a House campaign.  As part of the scheme, the defendant, Person G, and others conspired to, and did in fact, reimburse all of the conduits for the amounts they contributed to Candidate C using money provided by Person G.

33.    To execute the scheme, the defendant and others caused fake invoices to be sent to Company C, which is one of Person G's gaming businesses.   This provided cover for Person G to transfer to the defendant and others the amount of money necessary to cover the contributions by the conduits.   The defendant, Person G, and others, intended for these invoices to conceal the fact that the payments from Person G were, in truth and in fact, reimbursements of the funds that the conduits transferred to Candidate C's campaign in their own names, rather than reimbursements for the services indicated in the fake invoices.

34.    In accordance with the agreement between the defendant and Person G, Person G caused reimbursement payments to be made from Company C to Company D, which was controlled by the defendant, and to Company E, which was controlled by the defendant and another person.   The defendant and others then transferred those reimbursements from Company D to the individual conduits.

35.    Because the defendant knowingly and willfully caused contributions to Candidate C to be made in the conduits' names, when in reality the defendant knew that the true source of

the contributions was Person G, the defendant knowingly and willfully caused Candidate C's campaign committee to file false reports with the FEC that indicated the contributions came from the conduits.   Indeed, on November 18, 2015, Candidate C's campaign committee electronically filed a report with the FEC that listed the conduits as contributors.

36.     The defendant also used approximately $12,100 that had been donated to MMF to make unlawful conduit contributions to other candidates for federal office in Maryland.

37.     This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States.   It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

38.     The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

Date: Sept. 17, 2019          By: *Kimberly R. Pedersen*
Kimberly R. Pedersen
Assistant United States Attorney

AnnaLou Tirol
Acting Chief
Public Integrity Section

By: 
William J. Gullotta
John P. Taddei
Trial Attorneys

16

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, KELLEY ROGERS, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
KELLEY ROGERS

I am Danny Onorato, defendant's attorney.   I have carefully reviewed the above Statement of Facts with him.   To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Danny Onorato, Esq.
Attorney for KELLEY ROGERS

17