IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 19-CR-270 (LO) |
| v. | Honorable Liam O'Grady |
| KELLEY ROGERS, | Sentencing Hearing: January 17, 2020 |
| Defendant. | |

<u>UNITED STATES' SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorneys, hereby submits its position with respect to the sentencing of Kelley Rogers ("defendant"), who pleaded guilty to his role in a wire fraud scheme in violation of 18 U.S.C. § 1343 in the above-captioned matter.  The United States of America requests that the defendant be sentenced to 78 months in prison, which is at the low end of the applicable United States Sentencing Guidelines range.  The government also requests that the defendant be ordered to serve three years on supervised release, pay a $100 special assessment and $491,299 in restitution, and forfeit at least $208,954 to the United States, which is consistent with the Plea Agreement.

## I.      **INTRODUCTION**

As described in the Information, Statement of Facts, Presentence Report (PSR), and this Memorandum, in 2013 and 2014, the defendant and his cohorts engaged in a national fundraising scam that tricked thousands of small donors into contributing hundreds of thousands of dollars to political action committees (PACs) controlled by the defendant, including Conservative StrikeForce (CSF).  The defendant intentionally misrepresented to donors that these PACs would use the donations to support political candidates and causes, such as Candidate A's campaign for Governor of Virginia, Candidate B's campaign for Attorney General of Virginia, and the

assistance of wounded veterans attempting to transition from the battlefield to civilian life. Rather than use the donations to support these and other causes, the defendant misappropriated nearly all of the donations for his own personal benefit and for the benefit of his PACs and preferred vendors.  The defendant also caused the creation of false invoices to conceal the embezzlement of money from his PACs, manipulated mandatory reports to the Federal Election Commission (FEC) to cover his tracks, and funneled excessive financial contributions through multiple conduit donors to a candidate for federal office.

The defendant and his co-conspirators obtained these contributions by making representations that proved to be clearly false, such as "All contributions will be used by Strike Force for direct candidate contributions, independent expenditures[,] and Get Out The Vote activities in strict compliance with any and all campaign finance laws."  PSR ¶ 14.

A sentence of six and a half years is significant, but nothing about the defendant's conduct or his particular circumstances justify a lenient sentence below the calculated advisory Guidelines range.  The defendant's crimes are not victimless.  They involved thousands of victims and millions of dollars that the victims intended to spend on the political process in an exercise of their right to free speech, which is something so fundamentally important that it is protected by the First Amendment to the Constitution.  The defendant deserves a significant sentence that captures the gravity of his offense.

## II.    FACTUAL BACKGROUND

The defendant has been involved in political fundraising and consulting for most of his adult life.  PSR ¶¶ 109-113.  Probation was not able to verify this, but the defendant reports having received a certificate from the American Campaign Academy in 1989.[1]  In 2008, he

---

[1] Notably, it appears that in 1989 the American Campaign Academy lost its tax-exempt status following a finding that it operated for the substantial non-exempt purpose of benefiting

established Strategic Campaign Group (SCG), a campaign consulting company that was based in Arlington, Virginia, before moving to Annapolis, Maryland.  PSR ¶ 109.  The defendant was the President and owner of SCG.  PSR ¶ 109.  The defendant also created and operated multiple PACs, including Conservative StrikeForce, Conservative Majority Fund, and Tea Party Majority Fund.  PSR ¶¶ 13, 27; Def.'s Statement of Facts (SOF), Dkt. # 8, at ¶ 1.

In his role as the leader of SCG and his PACs, the defendant hired email, telemarketing, and direct mail vendors to send solicitations to donors all over the county.  PSR ¶ 13.  The defendant reviewed and approved the text and other content (including using the likenesses of candidates) contained in these solicitations.  *Id.*  He also decided what fundraising strategies to employ and how to spend the contributions his PACs received from donors.  *Id.*  The defendant received income from the PACs.  *Id.*

Between the years 2011 and 2018, the defendant's PACs raised $20,872,497 from donors.  PSR ¶ 65.  Only $269,376—approximately 1.3% of the money raised—was spent on direct contributions to political candidates.  PSR ¶ 65.  In contrast, the defendant gave as much as $13,724,032 of these donations to his "preferred vendors" to pay their fees, raise more money for the defendant's PACs, add new donors to the defendant's donor lists, and, in the defendant's own words, simply keep the churn going.  *Id.*  More than $5,000,000 was spent on other vendors and business expenses, or pocketed by the defendant and his friends.  *Id.*  Indeed, the defendant and CSF spent more paying off their legal fees than they gave to the candidates.  *Id.*

By early 2013, the defendant had engaged Company A as a vendor to create and deliver solicitations by email to potential donors on various lists.  PSR ¶ 15.  Company A maintained or rented lists of people who had previously donated in response to other fundraising campaigns.

---

private interests, as opposed to public interests.  *See American Campaign Academy v. C.I.R.*, 92 T.C. 1053 (1989).

CSF had its own list of donors—known in the fundraising industry as its "house file"— which Company A maintained for CSF.  PSR ¶ 28.  In the early part of 2013, the defendant and others concluded that the CSF house file was stale.  PSR ¶ 35; SOF ¶ 9.  The donors identified in the list were no longer contributing much money, and the defendant needed to come up with a plan to generate more donations.  *Id.*

In March 2013, the defendant and others were frustrated that a recently initiated fundraising effort involving the likeness of Candidate A, who ran for Governor of Virginia in 2013, had not been successful.  On March 25, 2013, co-conspirator Scott Mackenzie,[2] who served as the Treasurer of CSF (and over 50 other PACs), had the following to say to the defendant about the status of their fundraising and Candidate A: "We need to give our donors a reason to give, and it's … certainly not [Candidate A]… Let's try to brain storm some ideas in the next couple of days."[3]  Email from Scott Mackenzie to Kelley Rogers (March 23, 2013), attached as Ex. A.  Emails obtained by the government (and produced to Probation and the defendant) show that in the following months, the defendant, employees of Company A, Mackenzie, and others considered multiple topics that might inspire their donors to contribute money.  PSR ¶ 34; SOF ¶ 8.  They tested some of these issues by sending out fundraising solicitations with limited success.  In an email dated June 12, 2013, an employee of Company A told another co-conspirator, who worked for the defendant, that it was "[v]ery unfortunate that this [] campaign has turned out to be not as hot as we thought it would be.  But one way or

---

[2] On October 22, 2019, Mackenzie pleaded guilty in a related case to a single count criminal information charging him with false statements, in violation of 18 U.S.C. § 1001.  *See* Statement of Facts, ECF No. 6, *United States v. Mackenzie*, No. 1:19-CR-309 (E.D. Va.) (filed Oct. 22, 2019).

[3] All emails and other records referenced herein were produced to the defense and Probation.

another, we're going to make this up.  With all of the stuff going on in D.C. these days, something's got to stick."  Email from Person C to Kelley Rogers forwarding email from Company A (June 12, 2013), attached as Ex. B.

A.  <u>The Candidates A and B Scams in 2013</u>

In late June and early July 2013, the defendant and representatives of Company A came up with a plan to address the dismal fundraising results.  They decided to grow CSF's house file through a process called prospecting.  PSR ¶¶ 29, 36; SOF ¶¶ 3, 10.  They planned to rent donor lists belonging to other individuals or companies at a high cost and send solicitations to the prospective donors on these lists in the hopes that new donors would begin to contribute to CSF.  *Id.*  If a new donor contributed to CSF, then that donor could be added to CSF's house file, thus adding new blood to CSF's donor list.  The defendant's goal was not to support any causes or candidates with the money that CSF raised in 2013, as its solicitations stated CSF would, but instead to add as many new names to CSF's house file as possible so that the list would become profitable again in 2014.

To accomplish this goal, Company A recommended spending 75% of all donations received by CSF on this prospecting effort.  The defendant decided that he did not want to reserve even 25% of the donations for any causes and candidates; he wanted to go all in.  On June 28, 2013, the defendant wrote an email to Mackenzie in which he said: "We need to refresh and rebuild our list *for next year* so here is what we are going to do.  Starting July 1st we are going to use 100% of all net revenue that comes in for list building."  Email from Kelley Rogers to Scott Mackenzie (June 28, 2013) (emphasis added.), attached as Ex. C.  As such, by the end of June 2013, the defendant had decided and directed others to spend all net revenue from the donations that CSF received in 2013 on CSF's prospecting effort.  PSR ¶ 36; SOF ¶ 10.  Nothing

would be left over to spend on the issues or candidates that CSF would tell its donors that it supports. *Id.* As the defendant said, the "only exception to this may be Oct. of 2013 where we may need to use 25% of net just for that month because of the VA elections, but I'll get back to everyone on that as we get closer to that day."

### The Defendant Identifies Candidate A's Race for Governor As the Most Profitable.

The defendant settled on Candidate A's campaign for Governor of Virginia as the primary vehicle for this prospecting effort. Of course, the defendant faced a problem with this prospecting plan. While the defendant's intention was to spend all donor money to increase the size and quality of CSF's house list, this goal was not likely to generate much enthusiasm from potential donors. So, instead of being honest about his intentions, for the rest of 2013 the defendant and his co-conspirators lied and told donors that all of their donations would be spent on direct candidate contributions, independent expenditures, and get-out-the-vote efforts on behalf of Candidates A and B, as well as attorneys to safeguard the voting results on and after election day. PSR ¶ 38(a)-(o); SOF ¶ 12(a)-(o); *see also* Copies of Solicitations, attached as Ex. D. Email after email was sent to thousands of potential donors falsely assuring them that their donations would be spent on behalf of Candidate A and, later, Candidate B. These emails typically had an urgent and desperate tone in their claims that financial contributions could make a difference in the campaign. The defendant reviewed and approved all of the misleading statements in this scheme. These misleading solicitations, many of which are listed in the PSR and the SOF, and some of which are included as sentencing exhibits appended to this memorandum, demonstrate what the defendant represented to donors. *Id.* The behind-the-scenes communications, however, some of which are cited below and included as exhibits, make clear the defendant's true intentions.

By the end of July, the prospecting project using Candidate A's campaign as the bait was already producing results.  In an email dated July 24, 2013, Person D, who worked for Company A, told the defendant, "In a word, it's been awesome."  Email from Person D to Kelley Rogers (July 24, 2013), attached as Ex. E.  He continued:

> All of this has been done on our [Candidate A] campaign, so one thing's for sure – people love [Candidate A].
>
> We have four more lists rented for this week and next, and the plan is to continue putting [Candidate A] front and center until people just don't want to hear about him anymore.  And at this rate, we're still bringing in money faster than we can spend it – a very good place to be.  So the plan is to keep on churning, keep building this file, and keep staying in the black!

Not long after that email, Person E, another Company A employee, began to worry about how much money CSF was receiving in response to the Candidate A solicitations.  After all, the defendant and his co-conspirators were representing to donors that <u>all</u> of their donations would be spent for the benefit of Candidate A, when in fact <u>no</u> donor money was spent on his behalf.  On July 26, 2013, Person E wrote to the defendant:

> Things are rocking with [Candidate A].
>
> I'm a little concerned that we are mailing a lot and drawing a lot of attention to StrikeForce.  I think it would be a good investment to cut either a radio ad or a TV ad in support of [Candidate A].  I have guys who can handle that if you want.  If you have a team, that's perfect.  An ad like that would be great for fundraising too.  People love to give to get an ad on the air.
>
> Let me know what you think.

Email from Person E to Kelley Rogers (July 26, 2013), attached as Ex. F.  Despite Person E's apparent concern about getting caught, the defendant continued to direct that all donations should be spent on the prospecting effort, while also directing payments to CSF from time to time, which the defendant used to pay himself and SCG.

According to an August 1, 2013, email from Person D to the defendant, July "was a banner month for StrikeForce."  Email from Person D to Kelley Rogers (Aug. 1, 2013), attached as Ex. G.  He continued, "The VA governor's race has been a HUGE help to the program."  The word choice here is telling: the governor's race helped the program; the program did not help the race for governor.  He concluded, "All in all, we can't say enough good things about this program.  We're planning to keep on rolling with [Candidate A] until the results really start to drop off.  But until then, let's keep on growing!"  The defendant replied, "Awesome!"

The 100% prospecting effort continued through August and into September, when the defendant and his co-conspirators planned a "money bomb," ostensibly in support of Candidate A.  These "money bomb" solicitations, which were reviewed and approved by the defendant, included more intentional misrepresentations, including the following:

- "We just launched our emergency Virginia Victory Money Bomb because Tea Party hero [Candidate A] is about six points behind and he's desperately short on cash."
- "[Candidate A] needs a top-notch get-out-the-vote effort."
- "He needs to identify and target all of the undecided voters in the state."
- [Candidate A] needs us to raise this $50,000."

Contrary to these misrepresentations, the defendant and CSF had planned no get-out-the-vote effort.

By October 1, 2013, the defendant commented in an email that he was feeling pressure from others to actually contribute to Candidate A.  He told Person D, "I want to do all we can but I do not want to harm our prospecting plan."  Feeling this pressure, however, the defendant relented and directed a single $10,000 contribution to Candidate A's campaign.

The defendant continued CSF's prospecting effort based on misrepresentations about CSF's intent to support Candidate A, and CSF received tens of thousands of dollars more in donations.  By mid-October, Company A presented the defendant with several options for what

to do with the excess donations that CSF had received but not yet spent on more prospecting. The options were (a) use the money for candidate donations and independent expenditures; (b) reinvest in prospecting to continue building the house file; or (c) launch an online independent expenditure effort in support of Candidate A.  The defendant chose to continue prospecting.

***Misrepresentations in the Solicitations Regarding Candidate A***

Each of the solicitations for donations to CSF, which the defendant reviewed and approved, contained general statements of support for Candidate A and conservative values, but they also included specific misrepresentations about how the contributions would be spent.  For example, every solicitation approved by the defendant contained the following statement:

> All contributions will be used by Strike Force for direct candidate contributions, independent expenditures, and Get Out The Vote activities in strict compliance with any and all campaign finance laws.

This was intentionally false.

The landing page where a donor would be brought if he/she clicked on an email solicitation to donate to CSF stated:

> All money raised by Conservative StrikeForce's [Candidate A] Fund will be spent on behalf of [Candidate A] or given as a direct contribution.

This was intentionally false.

Other solicitations authorized by the defendant and purportedly supporting Candidate A contained the following misrepresentations to donors:

- "We are putting together one of the largest GOTV efforts in Virginia history."
- "We have drafted the largest GOTV plan in Virginia history.  Now all we need is to pay for the massive phone banks, absentee ballot campaigns, and the massive door-to-door effort that will win this."
- "[Candidate A] still needs help with his conservative turnout operations, and we need to pay for attorneys to fight ballot fraud across Virginia."
- "[Candidate A]'s path to victory is *very clear* ....  That is why it is so important that we raise the necessary funds for GOTV and Election Day lawyers."
- "We need to hire dozens of lawyers for Election Day and we need to do it now."

- "We still need to raise $9,857 to pay for the legal teams [Candidate A] needs to stop any Democratic fraud in its tracks."

Each of these statements was clearly false because, as demonstrated above, the defendant had already decided to spend 100% of the net revenue (essentially the total value of donations minus the cost of sending the solicitations) on building CSF's house list.

The defendant's misrepresentations continued even following the election, which Candidate A lost.  In post-election solicitations approved by the defendant, he told donors, "With your support, we were able to give $15,000 directly to [Candidate A]'s campaign and invest *tens of thousands more* in get-out-the-vote work on his behalf."  This statement contains two intentional misrepresentations – CSF gave $10,000, not $15,000 to Candidate A, and invested nothing in get-out-the-vote work.

### The Defendant Pivots to Capitalize on Candidate B's Campaign

When the defendant realized that Candidate B's campaign for Attorney General of Virginia was heading toward a recount, he and his co-conspirators used the remaining few weeks of that campaign to solicit money from donors using similar misrepresentations that falsely represented CSF's support of Candidate B.  Notably, when Candidate B's campaign learned that CSF was telling donors that it was raising money to support Candidate B, the campaign sent an email to the defendant to "strongly urge [the defendant] to halt sending misleading emails in support of [Candidate B]'s bid for attorney general through your organization conservative strike force PAC.  Unless your group plans to make a contribution to [Candidate B] directly, you are sending an unethical email and one that misleads the donor."

In response to this, the defendant wrote that he was "not going to let the tone of this little witch's email go unanswered," but he begrudgingly agreed to send a contribution to Candidate B.  In coming up with the amount to send, the defendant said, "Let's send an odd number like

4755 or something so it looks like we contributed what came in." But in the end, all the defendant could bring himself to contribute was $3,000.

***CSF's Total Haul in the Candidate A and B Scams***

In total, by misrepresenting its intent to financially support Candidates A and B, CSF received approximately $432,000 in donations from thousands of small donors. The defendant never spent a single dollar on telephone calls, door-to-door campaigns, or any other get-out-the-vote efforts. He did not purchase a single radio, TV, or other advertisement. He did not spend any money on attorneys to fight ballot fraud. Other than the $10,000 donation to Candidate A's campaign and the $3,000 donation to Candidate B's campaign—both of which were made after receiving pressure from external sources, and accounted for approximately three (3) percent of the donations received—the defendant spent the entirety of the donations either on himself, those in his inner circle, or the effort to grow CSF's house list.

B. The Scam Involving Solicitations for Veterans in 2014

In November 2014, the defendant and his co-conspirators embarked on another scheme to defraud PAC donors, this time by misrepresenting that donations would be spent in support of veterans returning from the battlefield. PSR ¶¶ 42-47. By this time, the defendant and his co-conspirators had been sued in federal court by Candidate A and his campaign for the above-described fraud in connection with the 2013 Virginia Governor's race. Undeterred, and while the civil lawsuit was pending, the defendant again used CSF to scam donors, this time using another preferred vendor, Company B.

The defendant's agreement with Company B, a telemarketing company, called for 100 percent of net revenue from telemarketing calls to be funneled back to Company B to support the defendant's prospecting effort, meaning, to continue renting lists to try to add new donors to

CSF's house file.  The defendant, through CSF, also paid Company B a flat fee for calls placed to donors already on CSF's house file.  As such, the agreement virtually guaranteed that there would be no money left over from the donations to spend on supporting veterans, as advertised.

Nevertheless, the scripts and letters used by Company B, which were reviewed and approved by the defendant, contained intentional false misrepresentations, such as the following:

> Our goal is to lobby Washington politicians and help as many Veterans as possible.  We need to ensure there are proper programs in place to help returning heroes with brain trauma to physical disabilities **transition from the battlefield to the workplace**.  That is why it is so critical to return your generous pledge … today.

(Emphasis in original.)  The script continued with additional misrepresentations:

> The Conservative StrikeForce is active[ly] blanketing the country with a network of messaging through social media, e-mails, Tele-Townhalls and independent expenditures.  We are determined to give those returning heroes from the frontlines real solutions to real problems."

These statements were all false.  CSF did not, and never intended to, take any action in support of veterans on social media, through emails, tele-town halls, or independent expenditures.  PSR ¶¶ 42-47; SOF ¶¶ 16-21.

One donor, himself a veteran, recalled receiving a call from Company B at a time when the VA's treatment of veterans was in the news, so the call he received grabbed his attention.  He told investigators that he "believed the money he donated to CSF would help veterans.  Many soldiers came back from combat without body parts, and he hoped the funds would assist the warriors."  Sadly, while the telemarketing campaign the defendant directed raised over $45,000, not a dime was spent to support veterans.  Even Company B's employees were appalled.  *See* CBS News, *Are some PACs scamming donors?* (online at

https://www.cbsnews.com/news/political-action-committees-pacs-scam-donors-misled-

conservative-strikeforce/ (video and other reporting on CSF, including this scam involving veterans and Company B)).

C.   In Addition to Duping Donors, the Defendant Also Embezzled From His PACs.

As the defendant has already admitted, he orchestrated a fake billing scheme to embezzle hundreds of thousands of dollars from various PACs under his control, including CSF.  PSR ¶¶ 48-53.  In this scheme, the defendant directed entities under his control and vendors in his inner circle to create and submit false invoices to the defendant's PACs.  *Id.*  These false invoices typically depicted services that were not actually performed by the vendors or entities under the defendant's control.  *Id.*  Upon receipt of the fake invoices, the defendant paid or directed others to pay the amount reflected on the invoice to the vendor or entity under the defendant's control. *Id.*  These entities and vendors then kicked money back to the defendant, often keeping a cut for themselves.  *Id.*  It was essentially a way for the defendant to check the balances of his PACs from time to time and make a "withdrawal" for personal use.  The fake invoices were simply cover.

D.   The Defendant Used Donations to Two PACs to Pay Legal Fees Incurred by Another PAC.

Between 2015 and 2018, the defendant used money raised by PACs under his control, including CMF and TPM, to pay down approximately $249,000 of the legal debt incurred by CSF as a result of the fundraising scams at issue in this case.  CMF and TPM solicited donations under the auspices of advancing conservative causes and candidates, and their donors were not told that the donations would be used to pay CSF's outstanding legal fees.  Under campaign finance laws, these PACs were prohibited from contributing more than $5,000 to CSF in any given year.  Nevertheless, the defendant took approximately $249,000 from CMF and TPM to pay down some of CSF's debt.  PSR ¶¶ 54-56; SOF ¶¶ 28-30.  Moreover, the defendant and his

co-conspirators failed accurately to report these payments to the FEC as contributions to CSF. PSR ¶ 56; SOF ¶ 30.  Many of these payments were falsely reported as typical PAC-related expenses, such as consulting, data processing, and email fundraising costs.  *Id.*

      E.   The Defendant Organized a Conduit Contribution Scheme.

Finally, as described in the PSR and the SOF, the defendant also admitted his role in a scheme to funnel excessive and illegal corporate contributions from Company C through conduit donors to Candidate C, who was running for federal office.  PSR ¶¶ 57-62.  This was yet another abuse of the political process that the defendant facilitated and managed.  The defendant personally acted as a conduit and directed the recruitment of at least ten other people as conduits in this scheme.  The conduits wrote checks from bank accounts under their control to Candidate C to make it appear as if the conduits were the actual source of the funds.  The total amount that the conduits illegally funneled to Candidate C exceeded $40,000.  The defendant directed reimbursement of these funds to the conduits.  *Id.*

## III.    APPLICABLE LAW AND THE PRESENTENCE REPORT

"When sentencing a defendant, the district court must: (1) properly calculate the Guidelines range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence."  *United States v. Simmons*, 269 F. App'x 272, 273 (4th Cir. 2008) (unpublished) (citing *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007)). Although the Sentencing Guidelines are "effectively advisory," *United States v. Booker*, 543 U.S. 220, 245 (2005), "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process," *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007); *see Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) (stating that "even in

an advisory capacity the Guidelines serve as a meaningful benchmark in the initial determination of a sentence and through the process of appellate review") (citation and internal quotation marks omitted).

The government agrees with the Probation Office's advisory Guidelines calculation of 78 to 97 months of imprisonment, to be followed by up to three years of supervised release.

A. Base Offense Level

The parties and the Probation Office agree that the base offense level is 7, pursuant to USSG § 2B1.1(a)(1).  PSR ¶ 75.

B. Loss Amount (§ 2B1.1(b)(1)(H))

The parties and the Probation Office agree that a 14-level upward adjustment applies pursuant to USSG § 2B1.1(b)(1)(H) because the total loss exceeded $550,000 but was less than $1,500,000.  PSR ¶ 76.  The PSR lists the total loss as $974,648.  *Id.*

C. The Offense Involved More Than 10 Victims (§ 2B1.1(b)(2)(A)).

The parties and the Probation Office also agree that a 2-level upward adjustment applies pursuant to USSG § 2B1.1(b)(2)(A) because the offense involved 10 or more victims and was committed through mass-marketing.  PSR ¶ 77.  Indeed, as described herein and reflected in the PSR, the offense involved approximately 9,000 victims and was achieved largely through the mass-emailing of solicitations for donations.  PSR ¶¶ 68, 77.

D. The Offense Involved a Misrepresentation that the Defendant Was Acting on Behalf of a Political Organization (§ 2B1.1(b)(9)(A)).

The government agrees with the Probation Office that, despite the defendant's objection, the defendant should receive a 2-level upward adjustment because his offense "involved a misrepresentation that [he] was acting on behalf of a . . . political organization."  USSG § 2B1.1(b)(9)(A); PSR ¶ 77.  As the Probation Office wrote in response to the defendant's

objection to this enhancement, "this case centers around the defendant's . . . misrepresentations that donations made to [his] PAC would be used to support" the campaigns of Candidates A and B.  PSR at p. 26 (Addendum).  The applicable Guidelines commentary expressly states that this enhancement "applies in any case in which the defendant represented that [he] was acting to obtain a benefit on behalf of a . . . political organization . . . regardless of whether the defendant actually was associated with the organization . . . when, in fact, the defendant intended to divert all or part of that benefit (*e.g.*, for the defendant's personal gain)."  U.S.S.G § 2B1.1, Application Note 8(B).  The commentary gives the applicable example of "[a] defendant who solicited donations from church members by falsely claiming to be a fundraiser for a religiously affiliated school."  *Id.* at Application Note (8)(B)(ii).  That is comparable to the defendant's actions in this case.  The defendant solicited donations from individuals by falsely claiming that he was raising funds to benefit the campaigns of Candidates A and B.  As described above, the defendant's solicitations gave the clear impression, often in express terms, that "All money raised by Conservative StrikeForce's [Candidate A] Fund will be spent ***on behalf of [Candidate A]*** or given as a direct contribution."  PSR ¶ 38(m); SOF ¶ 12(m) (emphasis added).  In reality, the defendant intended to divert all or part of these benefits to his PACs, his business partners, and himself.  The defendant has admitted these facts.  The upward adjustment should be applied.

    E.   The Offense Involved Sophisticated Means (§2B1.1(b)(10)(C))

    The government also agrees with the Probation Office that, despite the defendant's objection, the defendant should receive a 2-level upward adjustment because his offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  USSG § 2B1.1(b)(1)(C); PSR ¶ 79.  Under this section of the Guidelines, "'sophisticated means' means especially complex or especially intricate offense

conduct pertaining to the execution or concealment of an offense." USSG § 2B1.1, Application

Note 9(B). The defendant's offenses were complex, and he took critical steps to conceal them.

For example, the Application Note states that "in a telemarketing scheme, locating the

main office of the scheme in one jurisdiction but locating soliciting operations in another

jurisdiction ordinarily indicates sophisticated means." *Id.* The defendant did exactly this in this

case. In the veterans scam, the defendant's main operations were run out of Strategic Campaign

Group and CSF. Those offices were located first in Virginia and later in Maryland. The

telemarketing company, identified as Company B, and its stable of cold-callers were located in

Wisconsin, where they made calls to victims throughout the United States. This justifies the

upward adjustment for the use of sophisticated means.

Furthermore, the defendant also employed a false billing scheme in order to embezzle

money from his PACs, misappropriating nearly $200,000 in 2016 and 2017 alone. PSR ¶¶ 48-

53. This is a sufficient basis for the application of this upward adjustment. *See, e.g., United

States v. Stone*, 85 F. App'x 925, 938 (4th Cir. 2004) (unpublished) (holding, in case involving

the use of false invoices, as well as fictitious entities and other deceptive conduct, "[w]hile it is

true that the commentary to the Sentencing Guidelines illustrates with examples suggesting a

higher level of financial sophistication, … the essence of the definition is merely deliberate steps

take to make the offense difficult to detect") (citation and internal quotation marks omitted); *see

also United States v. Tanke*, 743 F.3d 1296, 1307-08 (9th Cir. 2014) (upholding the application

of the sophisticated means enhancement where the defendant "created at least six false invoices

and falsified carbon copies of checks … on at least 10 occasions to conceal the payments");

*United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (defendant fabricated numerous

documents); *United States v. Armas*, 712 F. App'x 923, 927 (11th Cir. 2017) (defendant "created

17

billings to Medicare for fraudulent prescriptions [and] created false invoices to attempt to cover up the scheme from auditors").

Moreover, the defendant's scheme was widespread, lasted for years, involved over 9,000 victims, and employed a cast of supporting co-conspirators who worked for CSF or its preferred vendors.  The defendant also used Candidate A's likeness prominently throughout the solicitations he sent to his victims, tricking some of the donors into believing that CSF was associated with Candidate A.  He also orchestrated the excessive campaign contributions to Candidate C and masked them through the use of multiple conduits, which caused the campaign that received the contributions to make false filings with the FEC, thereby covering up the true source of the illegal campaign donations.

All of this supports the 2-level upward adjustment for the use of sophisticated means.

F.   The Defendant Was The Organizer and Leader of Criminal Activity That Involved Five or More Participants or Was Otherwise Extensive (§3B1.1(a)).

The government agrees with the Probation Office that a 4-level upward adjustment applies pursuant to USSG § 3B1.1(a) because the defendant was an organizer and a leader of criminal activity that involved five or more participants and was otherwise extensive.  PSR ¶¶ 71, 81.  The defense does not object to this role enhancement.  *See* PSR at p. 26 (Addendum) (identifying defense objections only to the adjustments in PSR ¶¶ 78 and 79).  The Guidelines include this section to guide the courts in differentiating between the relative culpability of multiple participants in a criminal scheme.  There is no doubt that Kelley Rogers was the organizer and leader of this scheme.  He recruited and directed other members of the conspiracy, including Persons A, B, and C.  He also directed and managed the 10 or more conduit contributors involved in the scheme to funnel corporate funds to a congressional candidate.  *See*

PSR ¶¶ 57-62.  The defendant also reviewed, approved, and directed the actions of the vendors who carried out his conduit criminal scheme, including Persons D and E.

### IV.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

A sentence within the applicable guidelines range is warranted in this case.  A downward variance would be inappropriately lenient and unjustified, and would send a discouraging message to the public that its federal courts do not take seriously white collar crime in general, and particularly the protection of the political process.

The Supreme Court has noted that the "Guidelines . . . seek to embody the § 3553(a) considerations, both in principle and in practice."  *Rita v. United States*, 127 S. Ct. 2456, 2464 (2007).  These factors or considerations include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence; and protect the public from further criminal conduct by the defendant.  18 U.S.C. § 3553(a).

A.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1).

**1.  Nature and Circumstances of the Offense.**

The defendant's multiple offenses are serious, and they affected thousands of innocent donors located across the country and cost millions of dollars.  His conduct lasted for years, only stopping once the federal government intervened.  The defendant orchestrated a scheme intentionally designed to take advantage of the political passions and rights of the American public to participate in the political process, and people's eagerness to contribute money to support their genuine and strongly-held political views.  This is made clear by the unabashed "flag-waving" language approved for use in his solicitations.  He did this by portraying himself and his PAC as a "Conservative StrikeForce" working to advance political causes and candidates

through the contribution of money, when in reality the defendant's goal was to do and say whatever was necessary to continue receiving the donations that supported his lifestyle.

Moreover, the defendant continued his egregious conduct despite receiving complaints and warnings from Candidate A's campaign, Candidate B's campaign, the FEC, and others. This was not a one-off crime of opportunity, as some other "scam PAC" cases charged in other courts have been. This defendant has made a career out of duping donors out of their money. His offense is serious, and so should be his sentence.

### 2. The History and Characteristics of the Defendant.

The defendant's recent history is riddled with lies to donors, false statements to the FEC, and fake invoices used to embezzle hundreds of thousands of dollars from his own PACs. He presents no mitigating information in the PSR to excuse or explain his conduct. Indeed, he describes his upbringing as "awesome." PSR ¶ 97. He could not have had a better childhood. *Id.* He experienced no neglect, abuse, or history of mental illness or criminal activity in his family. He stayed in Texas, where he was raised, until he was 24, when he moved to Washington, D.C. He enjoyed various jobs in the political space, which was his chosen profession. The defendant simply experienced no hardships that could come close to justifying or explaining his manipulative and deceptive criminal conduct. This factor weighs in favor of a Guidelines sentence.

### B. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A))

A downward variance from the Guidelines in this case would fail to accomplish the goals of Section 3553(a)(2)(A). The defendant stole money that donors hoped – and were promised – would be part of the political process. This was also money that the candidates or veterans may have otherwise received and used to support their efforts had the defendant not intervened and

intercepted it.  The defendant's fraud targeted small donors, not wealthy investors.  If this

conduct is not punished significantly, respect for the law will be diminished.

    C.   <u>Specific and General Deterrence, and the Protection of the Public from Further Crimes of the Defendant</u>.

A significant guidelines sentence is necessary to deter this defendant, and to send a

message of deterrence to others contemplating or actively committing similar conduct today,

particularly as the country gears up for what will likely be a very active year of fundraising in

advance of the 2020 elections.

The ability to raise significant contributions to political action committees has made

political fundraising a ripe target for criminal fraud schemes.  Schemes like the one perpetrated

by the defendant and his co-conspirators directly injure the political process by both siphoning

money intended to support political candidates and contributing to public mistrust in the political

fundraising process.  It is important for this Court to send the right message about the seriousness

of the offense to deter others.

    D.   <u>The Need to Avoid Unwarranted Sentencing Disparities</u>.

To date, only three other federal "scam PAC" cases have been charged and defendants

sentenced.  As the courts have begun to see and understand this type of criminal conduct, the

cases have resulted in increasingly significant prison sentences.  Moreover, the present case

involves a greater loss amount and/or larger number of victims than the prior cases.  Giving this

defendant a more lenient sentence than his predecessors would harm the ongoing effort to deter

this type of fraud.

William Tierney was sentenced to 24 months in prison in the first case of this kind

prosecuted by the U.S. Department of Justice.  *See United States v. William Tierney*, 18-CR-804-

1 (S.D.N.Y.); *see also*, U.S. DOJ Press Release (March 15, 2019) (online at

https://www.justice.gov/usao-sdny/pr/fraudulent-political-action-committee-operator-sentenced-two-years-prison).  However, Tierney pleaded guilty to a different crime, namely, conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, which carries a lower maximum penalty (five years of imprisonment) and lower base offense level (6) than the substantive fraud offense to which Kelley Rogers pleaded guilty.  It appears Tierney's sentence was 13 months below the low end of the applicable Guidelines range.

Next, Harold Russell Taub was sentenced to 36 months in prison.  *See United States v. Harold Taub*, 19-CR-015 (D.R.I.); *see also*, U.S. DOJ Press Release (July 24, 2019) (online at https://www.justice.gov/usao-ri/pr/former-candidate-sentenced-fraud-and-campaign-finance). The district court in *Taub* applied the enhancement for misrepresenting that the defendant acted on behalf of a political organization.  Taub's offense involved fewer victims than Kelley Rogers'.  His sentence was approximately five months below the low end of the applicable Guidelines range.

Most recently, Kyle Gerard Prall was sentenced to 36 months.  *See United States v. Kyle Prall*, 19-CR-013 (W.D. Tex.); *see also*, U.S. DOJ Press Release (Oct. 29, 2019) (online at https://www.justice.gov/opa/pr/texas-man-sentenced-prison-fraudulent-scheme-solicit-hundreds-thousands-dollars-contributions).  Prall's sentence was three months *above* the low-end of the applicable Guidelines range in that case, and the court applied the adjustment for misrepresenting that the defendant acted on behalf of a political organization.  As described to the court at sentencing, Prall's offense involved more than 400[4] donors and $548,428 in donations, and lasted approximately 10 months.  In contrast, Kelley Rogers, a seasoned political operative, kept

---

[4] After sentencing, it was discovered that Prall's offense involved over 6,000 victims.

his fraud schemes going for years, including after being sued by Candidate A and warned by Candidate B.

In addition to the greater severity of Kelley Rogers' scam PAC case, the defendant has admitted to additional significant criminal conduct.  He embezzled money from his PACs though a false billing scheme, he caused excessive contributions from two of his PACs to CSF to pay for its legal bills, and orchestrated a conduit contribution scheme involving many others to conceal illegal campaign contributions to a candidate for federal office.  This additional conduct further justifies a more significant sentence in this case than in any of the previous scam PAC cases.

V.     **CONCLUSION**

For the reasons set forth herein, the government respectfully requests a low-end Guidelines sentence of 78 months of imprisonment, three years of supervised release, a $100 special assessment, restitution in the amount of $491,299,[5] and the forfeiture of at least $208,954.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:        _/s/ Kimberly Riley Pedersen_
Kimberly Riley Pedersen
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Ave
Alexandria, VA
Phone: 703-299-3700
Email: Kimberly.Riley.Pedersen@usdoj.gov

---

[5] Restitution is to be ordered paid immediately unless the Court determines the interests of justice demand payment on a subsequent date certain or in installments.  18 U.S.C. §3572(d)(1). In this case, Defendant's overall financial resources and assets demonstrate that he can and should make a substantial payment of $30,000 toward restitution within 14 days of the entry of the proposed restitution order.  Defendant has liquid assets of approximately $30,000 according to the PSR.  ECF no. 14 at ¶78.

Corey R. Amundson
Chief, Public Integrity Section

By:         /s/ *William J. Gullotta*
William J. Gullotta
John P. Taddei
Trial Attorneys
U.S. Department of Justice
Public Integrity Section
1331 F Street NW
Washington, DC 20004
Phone: 202-514-1412
Email: William.Gullotta2@usdoj.gov
        John.Taddei@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2020, I electronically mailed a copy of the foregoing to Danny Onorato and Stuart Sears, the attorneys of record for the defendant.

_____/s/_____
William J. Gullotta
Trial Attorney and Special Assistant United
States Attorney