**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 1:19-CR-270 (LO)** |
| **KELLEY ROGERS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT KELLEY ROGER'S MEMORANDUM IN AID OF SENTENCING**

COMES NOW the defendant, Kelley Rogers, by and through undersigned counsel, and in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), respectfully submits to this Honorable Court his position with respect to sentencing. As the Court is aware, Mr. Rogers entered a pre-indictment guilty plea to a felony information charging him with one count of wire fraud in violation of 18 U.S.C. § 1343. For the past three decades, Mr. Rogers has had a successful career consulting with candidates for public office and raising funds for those campaigns. He recognizes that he has engaged in the criminal conduct that resulted in his guilty plea and that his actions were wrong. Simply put, more recently, he put his own potential business interests in the way of his responsibilities to clients and causes he was to serve. Mr. Rogers has accepted responsibility and is making amends for his conduct.

When Mr. Rogers appears for sentencing on January 17, 2020, the Court must determine a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of federal sentencing given the unique circumstances of this case. 18 U.S.C. § 3553(a). As the Presentence Investigation Report ("PSR") reflects, Mr. Rogers is 56 years old and his Criminal History Score is I. As we detail below, he has led an exemplary life and has demonstrated extraordinary kindness and support to family

members, friends and the community at large. We therefore respectfully submit, that a sentence of 24 months of incarceration is sufficient, but not greater than necessary, to achieve the purposes of federal sentencing in Mr. Rogers's case, when measured against similar prosecutions by the Department of Justice.

## ARGUMENT

As the Court is aware, *United States v. Booker*, 543 U.S. 220, 226 (2005), rendered the United States Sentencing Guidelines purely advisory. The applicable advisory Guidelines range now is merely one factor that the Court must consider when imposing a sentence, and the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). The Court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute. *See* 18 U.S.C. § 3553(a)(2). Mr. Rogers asks the Court to impose a sentence of 24 months of incarceration, one that is more than sufficient to meet the goals of sentencing, as explained below.

### I. THE ADVISORY SENTENCING GUIDELINES RANGE

The first step in post-*Booker* federal sentencing requires the Court to calculate the applicable advisory Guidelines range. The statutory maximum punishment for Mr. Rogers's offense is 20 years of imprisonment, a fine of $250,000 or twice the gross gain or loss, whichever is greater, full restitution, a $100 special assessment and a supervised release term of not more than three years. Plea Agreement at 1. The parties do not dispute that the applicable base offense level is 7. The parties also agree that there should be a 14-level increase to the base offense level under U.S.S.G. § 2B1.1(b)(1)(d) because the loss amount is more than $550,000 but less than $1,500,000; and a 2-level increase under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims. Mr. Rogers does not object to a 2-level enhancement because of an

alleged misrepresentation that Mr. Rogers was acting on behalf of a charitable, educational, religious or political organization. U.S.S.G. § 3B1.1(b)(9)(A).

The government and the PSR ask the Court for a 4-level increase under U.S.S.G. § 3B1.1(a) because they allege that Mr. Rogers was an organizer or leader and criminal activity involved five or more people. In addition, they ask the Court to apply a 2-level sophisticated means enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

***A. The Sophisticated Means Enhancement is not Applicable***

As a threshold matter, when Mr. Rogers and the government negotiated the plea agreement, the parties understood all of the conduct at issue and the government did not elect to seek the sophisticated means of enhancement. That was for good reason as the government maintains the burden of establishing that the conduct at issue amounts to "sophisticated means by a preponderance of the evidence. *United States v. Adepoju*, 756 F.3d 250, 257, (4th Cir. 2014). "'Sophisticated means' means especially complex or especially intricate offense conduct, pertaining to the execution or concealment of an offense.... Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means*." Id.*, quoting U.S.S.G. § 2B1.1 cmt. n. 9(B), (other citation omitted). Sophisticated means requires "more than the concealment or complexities inherent in fraud." *Id.*

Given those parameters, the facts here do not rise to the level of sophisticated means. Indeed, the facts surrounding Mr. Rogers' offense conduct are really quite simple. Mr. Rogers made misrepresentations in his solicitations for contributions and did not use the funds he received for the purposes claimed in his solicitations. We respectfully submit that the garden variety conduct at issue in this case is insufficient to warrant the enhancement.

***B. The More Than Five Participants Enhancement is Not Applicable***

Mr. Rogers pled guilty to wire fraud in violation of 18 U.S.C. § 1343 with respect to running his Political Action Committees ("PACs"), which included a fundraising effort to support the Cuccinelli Gubernatorial Campaign. He understands and acknowledges that there are other individuals that were involved in the offense. However, the government cannot establish that five or more individuals were "knowingly" involved in the offense. In other words, in order for the enhancement to apply, the individuals involved must have known of Mr. Rogers' wrongful conduct.

In its pleading, the government only lists Persons A, B and C as members of the conspiracy for the offense of conviction, which does not amount to 5 participants. Instead, the government is attempting to bootstrap members of the separate uncharged conduit contribution scheme as a basis for the enhancement, which is unrelated to the offense of conviction. Because Mr. Rogers did not plead guilty to the conduit contribution offense, and given the severe impact that the enhancement for this unrelated conduct would have on the overall sentencing range, Mr. Rogers asks the Court to find that the enhancement is not applicable to the offense of conviction.

For the reasons set forth above, Mr. Rogers asks the Court to conclude that the applicable guideline range after acceptable of responsibility is a level 22, or an advisory sentencing range of 41-51 months.

Moreover, Mr. Rogers asks the Court to find that, in light of the unique and compelling circumstances of this case and his lack of any prior criminal history, the Guidelines produce an advisory sentencing range that is higher than necessary to serve the purposes of federal sentencing and that fails to adequately account for his swift acceptance of responsibility, extraordinary personal history, and very low risk of recidivism.

## II. THE GUIDELINES RANGE, SENTENCES AVAILABLE, AND POLICY CONSIDERATIONS

The above discussion of the appropriate Sentencing Guidelines calculation is relevant to only one of the many factors this Court must evaluate in sentencing Mr. Rogers. As noted earlier, "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (internal quotation marks omitted). Although the Court "must include the Guidelines range in the array of factors warranting consideration" as it determines an appropriate sentence under § 3553, *United States v. Kimbrough*, 552 U.S. 85, 91 (2007), it is also the Court's important prerogative to decide independently how much persuasive authority the advisory Guidelines range should receive in a particular case. Additionally, the Court must consider all of "the kinds of sentences available" by statute, *see* § 3553(a)(3).

In post-*Booker* federal sentencing, the district court's broad discretion includes the authority to question whether an advisory Guidelines sentence truly reflects the sentencing considerations contained in 18 U.S.C. § 3553. *See Kimbrough*, 552 U.S. at 109. Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Id*. at 101 (internal quotation marks omitted) (alteration in original). A sentencing court may diverge from the advisory Guidelines range when "the Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted." *Pepper v. United States*, 562 U.S. 476, 501 (2011). Additionally, when a Guidelines range is not the product of "empirical data and national experience," courts have the discretion to conclude that the recommended sentence fails to achieve the purposes of federal sentencing under 18 U.S.C. § 3553(a), even in "mine-run" cases. *See Kimbrough*, 552 U.S. at 109-10.

There is recognition amongst the courts that § 2B1.1, the Offense Guideline relevant here, violates Congress's mandate to the Sentencing Commission because it is not based on empirical data or national experience. *See, e.g.*, *United States v. Gupta*, 904 F. Supp.2d 349, 351 (S.D.N.Y. 2012); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006). In the three decades since the Sentencing Guidelines were first promulgated, fraud sentences under § 2B1.1 have nearly tripled. That dramatic increase is driven by an arbitrary and singular focus on one factor: the loss or gain occasioned by the offense. This tunnel-vision approach departs importantly from statutory requirements:

> By making a Guidelines sentence turn, for all practical purposes, on this single factor [loss or gain occasioned by the offense], the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.

*Gupta*, 904 F. Supp.2d at 351 (internal citations omitted); *see also Adelson*, 441 F. Supp. 2d at 509 (scrutinizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss" without "explaining why it is appropriate to accord such huge weight to [this] factor[]"). At the same time, the fraud Guideline ignores a host of factors that are important to calibrating fair and just punishment.[1]

Courts also have recently criticized the role the Guidelines play in increased incarceration rates through the overly formulaic and less motivated enhancements that attend to financial crimes. In the words of one district judge: "The Sentencing Commission to this day has never been able to articulate why it has two points for this, or four points for that. These are just numbers. And yet

---

[1] *See United States v. Ovid*, 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010) (noting that "the fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so").

once they are placed the whole thing is blessed and said to be rational." *See* Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*, Federal Sentencing Reporter, (Vol. 26, No. 1 October 2013), p. 6-9. Indeed, district judges imposed below Guidelines sentences in 56% of all fraud cases in the third quarter of 2017.[2]

Indeed, with respect to the $432,000 in losses attributable to the Cuccinelli Campaign, it is important for the Court to appreciate that long-time political consultant Charlie Black, who had represented that he was acting on behalf of Mr. Cuccinelli, sought Mr. Rogers' assistance on behalf of the campaign. Mr. Rogers incurred significant costs to carry out the fundraising efforts, including spending money on direct mail and phone solicitations. While misrepresentations were made in the solicitations, there was not a significant amount of money to provide to the Campaign after the expenses were paid. Thus, Mr. Rogers did not profit from this activity. Moreover, Mr. Cuccinelli's campaign benefitted from Mr. Rogers sending positive messages about the campaign to those his representatives contacted. Indeed, thousands of phone calls, emails and letters were sent endorsing and reflecting positively on Candidate Cuccinelli.[3]

Because U.S.S.G. § 2B1.1 does not implement the Sentencing Commission's Congressional mandate, does not reflect Congressional sentencing policy, and is misaligned with the purposes of federal sentencing in ways that are directly relevant this case, we ask the Court to

---

[2] *See* United States Sentencing Commission, 3rd Quarter Release Preliminary Fiscal Year 2017 Data – Through June 30, 2017, at Tbl. 10 (Sept. 7, 2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencingupdates/USSC_Quarter_Report_ 3rd_FY17.pdf (last visited on October 16, 2017).

[3] Indeed, Lee E. Goodman, a former commissioner of the Federal Election Commission, recognized at a public hearing that efforts like Mr. Rogers' are 90% public advocacy because they advocate on behalf of candidates and causes *in their solicitations*. In other words, Mr. Cuccinelli's campaigns and other candidates for office have received significant benefit from Mr. Roger's efforts. *See* Hearing transcript of September 14, 2017, attached as Exhibit 1.

give the proposed guidelines range minimal weight, and to focus on the stated policy goals of Congress in fashioning a just sentence in this case.

## III. THE OTHER 18 U.S.C. § 3553(A) FACTORS

With the foregoing in mind, we turn to the remaining factors relevant to sentencing under 18 U.S.C. § 3553. The "formidable responsibility" of arriving at a fair and just sentence requires the "court to consider, with great care and sensitivity, a large complex of facts" and cannot be "reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). A sentence that varies from the advisory guideline range may be based on "an individualized determination that [the Guidelines] yield an excessive sentence in a particular case." *Spears v. United States*, 555 U.S. 261, 264 (2009). In the post-*Booker* era, the sentencing court's duty is to consider all the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in the statute.

Those four purposes are the need for the sentence imposed to: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553 requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s). 18 U.S.C. § 3553(a)(1)-(7).

As noted above, under § 3553 the advisory Guideline range receives no presumption of reasonableness, nor does any presumption of unreasonableness attach to a sentence that varies from the Guideline range. *See Gall*, 552 U.S. at 50; *see also id*. at 52 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)). Here, we submit that a sentence of 24 months confinement would be sufficient, but not greater than necessary, to address all of the § 3553(a) sentencing factors.
These anecdotes, collected over a lifetime, are the truest measure of Mr. Rogers's character.

**A. The Nature and Circumstances of the Offense**

As evidenced by his pre-indictment guilty plea, Mr. Rogers accepts complete responsibility for his misconduct.[4] The nature and circumstances of his offense are largely addressed in the offense conduct portion of the PSR, which incorporates the Statement of Facts submitted at the time of his guilty plea. While the PSR and Statement of Facts present the relevant facts necessary to support the conviction, we provide the additional information set out below not to diminish Mr. Rogers's responsibility, but to provide context for the Court's determination of an appropriate sentence in this case.

This case is similar to the three cases cited in the government's memorandum, all of which resulted in substantially lesser prison sentences than the one that is being sought in this case. For

[4] Mr. Roger's Letter attached as Exhibit 2.

example, unlike the *Tierney* case, Mr. Rogers did not own the direct mail and telephone solicitation companies and did not profit from them.

For the past 30 years, Kelley Rogers has been serving as a consultant on Republican political campaigns.  He has, at times, advised on strategy, been employed as a fundraiser for individual candidates and PACs, and has raised awareness for conservative political issues.  As the letters provided to the Court attest, he was well-regarded in his field.

Mr. Rogers was asked to assist the Cuccinelli Campaign by Charlie Black, a well-known political consultant.  Mr. Rogers began a phone solicitation and marketing effort to assist the campaign.  Unfortunately, as detailed in the statement of facts, Mr. Rogers did so by overpromising what he would be doing to assist the campaign and not using the raised funds for the stated purpose.  Phone banks and donor solicitation programs are labor intensive and have high costs.  Mr. Rogers used the majority of the funds to pay for the costs associated with the program and only a small portion of the money actually went to the campaign.  Money was also not used for the purpose stated in the solicitations.

In total, $432,712 was raised for the campaign.  Mr. Rogers and Conservative Strike Force, the PAC at issue, netted approximately $27,663 after paying costs including the fee for renting mail lists.  That money should have been used the way that the solicitations had promised.  They were not and Mr. Rogers knows it was wrong but he did not profit from this endeavor.  Indeed, after he was sued by Mr. Cuccinelli, Mr. Rogers settled the matter with Mr. Cuccinelli for $85,000.  He also gave Mr. Cuccinelli copies of the house files generated by and used for the campaign, which are significant assets.   He was also given a copy of all of Mr. Rogers' unrelated house files.

Mr. Rogers engaged in a number of other campaigns that were likewise misleading.  He deeply regrets his conduct and put the needs of growing the PACs and house files, over the needs

of candidates and political issues, and the importance of being transparent with potential donors. One such program involved solicitations on behalf of veterans.  Mr. Rogers engaged in a one-week program to see if this effort would be successful.   Less than $5,000 remained after costs were deducted for the program.  He regrets not using these funds as he promised.

Finally, Mr. Rogers regrets facilitating conduit contributions to a candidate for political office.  He knows better and has vowed to never do so again. We ask the Court to consider his acceptance of responsibility and his civil settlement with Mr. Cuccinelli as mitigation for the harm he has caused.  Mr. Rogers has terminated the operations of the PACs at issue.

**B. Mr. Rogers' Personal History and Characteristics**

Kelley Rogers was born in Texarkana, Texas, on November 18, 1963, the third of four children born to Wesley Rogers and Bobbie Rosa Rogers.  Mr. Rogers grew up in a modest home in rural Texas.   His father worked as a railroad engineer and his mother was a homemaker.

When he was 10 years old, his father decided to run for the local school board and Mr. Rogers recalls going door-to-door with his father to run his campaign.  That event helped shape the rest of Mr. Rogers' professional life.

After high school, Mr. Rogers moved to Washington, D.C. and enrolled at the American Campaign Academy.  After obtaining a certificate in the late 1980's, he began a career in politics working on many individual campaigns.   As the Court can see from the letters attached, Mr. Rogers has had a successful career and was well-regarded by his peers and clients.  Indeed, a number of candidates have written the Court to attest to his character and his work ethic.

The conduct that put Mr. Rogers before the Court was not driven out of greed.  Mr. Rogers does not own a home, maintains a modest lifestyle, and earned between $68,666 and $118,762 between the years 2015-2018.  Now, Mr. Rogers faces the unenviable task of reestablishing

himself and rebuilding his career once he is out of prison. Thankfully, he has supporters who have forgiven him and will support him going forward.

In evaluating the § 3553 factors, we would ask the Court to weigh heavily the observations of family members, friends, business associates and acquaintances in fashioning a sentence. The attached 25 letters describe Mr. Rogers as benevolent, charitable and reliable. *See* Letters Attached as Exhibit 3. Simply put, Mr. Rogers has an inclination towards helping and comforting people in difficult and dire circumstances.

Mrs. Danna Rogers Blount, a retired nurse of thirty-five years, describes how supportive Mr. Rogers was when she tragically lost her son and daughter. "My son, Jim, was struck and killed by a drunken driver…My daughter Toy, was a victim of domestic violence in 2005…Kelley was there with love, strength and support for me…His encouragement and help led us to put our family's energies into supporting programs like MADD (Mothers Against Drunk Driving) and the creation of the Toy Murphy Bradshaw Fund."

Mr. Rogers' younger brother, Bo, recalls how Mr. Rogers selflessly cared for his elderly parents towards the end of their lives. "I remain grateful to this day for the time and energy Kelley dedicated to my parents in their final years. His determination to make them as happy and comfortable as possible made a very difficult situation better…He traveled almost every week from Washington to Texas to help my parents."

As a close friend and colleague, Ismael Canales, the President of the Maryland Fraternal Order of Police, has written to describe the impact that Mr. Rogers had on him professionally, but also, personally. "Kelley has provided professional services for my organizations throughout the years and his work was always of the highest quality…." Mr. Rogers has worked to assist law enforcement and has earned their respect.

Mr. Canales described how comforting Mr. Rogers was when he tragically lost his son. "My son Christopher was a bright, talented young man who was suddenly taken from our family…due to complications from a severe asthma attack…I wanted to have a written tribute…and turned to Kelley for assistance. He said, 'I'll take care of it,' and in a matter of hours, produced a beautiful memorial to my son…" It is evident that Mr. Rogers's compassion is sought in times of tragedy because of his calm resolve to help those around him, in any capacity.

Mr. Rogers also undertook extraordinary measures to help save Rosecroft Raceway as it was about to be foreclosed upon.  Mr. Rogers was instrumental in helping to save 100 jobs for raceway employees and an additional hundreds of jobs in the Maryland equine industry.

Tammy L. Lafferty, a managing board member of the Rosecroft Raceway and assistant State's Attorney in Calvert County, Md., served alongside Mr. Rogers.  She writes, "[u]ltimately, [Mr. Rogers'] management skills helped in locating a purchaser for the track. He spent untold volunteer hours working tirelessly to assist the horsemen associated with Rosecroft and saved an entire industry…."  She describes his efforts to help underprivileged children and the needy in the community.  She urges the Court to give Mr. Rogers a second chance.

 It is clear that for Mr. Rogers, his community is his home and extended family.  He invested countless hours in his community.  It is a special and unique trait that few people possess.

All of the letters written to the Court reflect that Mr. Rogers has accepted responsibility and has asked for forgiveness for his actions.  Nino Mangione, a Member in the Maryland House of Delegates describes that he has "witnessed the suffering his professional impropriety has imposed on him. The matter has been the subject of headlines and public ridicule. Kelley's reputation has been tarnished. Yet, through all of this, he has never once tried to excuse his bad judgment or avoid responsibility."

These are but a handful of stories provided by the community that illustrate his generous spirit and care for others. While Mr. Rogers's conviction will alter his future irrevocably, we respectfully submit that these other measures of Mr. Rogers's character must be considered to develop a full picture of him for purposes of sentencing.

**C. A Sentence of 24 Months Would Satisfy the Purposes of Sentencing**

A criminal sentence must be designed with consideration of the seriousness of the offense, the need to promote respect for the law and provide just punishment, the need to provide the defendant with needed medical care,[5] and the goals of providing deterrence and protecting the public. 18 U.S.C. § 3553(a)(2). It must also be "sufficient but not greater than necessary" to serve these purposes. 18 U.S.C. § 3553(a). In light of the facts of this case, a sentence of 24 months incarceration is sufficient to meet all of the goals set forth in § 3553(a)(2).

With respect to the retributive purpose of sentencing, we note that this case has already had devastating consequences for Mr. Rogers. He has been the subject of adverse media coverage and his ability to work in his chosen profession has been compromised. He understands that his own choices have put him in this untenable position. Mr. Rogers's reputation in the community is irreparably harmed. Along with these consequences, we respectfully submit that a sentence of 24 months incarceration is sufficient for Mr. Rogers to repay his debt to society.

Regarding specific and general deterrence, there is no question that Mr. Rogers appreciates the seriousness of his offense and has accepted complete responsibility for his actions. At 56 years old, and in light of his contrition and the publicity surrounding this case, he presents virtually no

[5] We have also attached a letter from Mr. Rogers' physician which illustrates he has a myriad of significant health issues, which we submit is also worthy of this Court's consideration. A number of Mr. Rogers' friends have expressed concern to the Court about his increasing use of alcohol to deal with the stress of this situation. We would ask the Court order him to be evaluated and treated, if necessary, by the Bureau of Prisons.

risk of recidivism, another factor relevant to sentencing under § 3553.[6] *See, e.g. United States v. Hamilton,* 323 F. App'x. 27, 31 (2d Cir. 2009) (finding "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming a below-guideline sentence based on the defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (granting a variance to a 57-year-old defendant because recidivism drops with age). A strong message of both specific and general deterrence has already been sent in this case as a result of the publicity surrounding it. This publicity will certainly continue, if not intensify, after sentencing and the strong deterrence message will be unmistakable given the prison sentence Mr. Rogers will receive.[7] Additionally, Mr. Rogers has been prohibited from operating his business without notifying customers and donors about his offense of conviction.

With respect to the fourth stated goal of sentencing, rehabilitation, a sentence of 24 months is undoubtedly adequate to afford Mr. Rogers the time and opportunity he needs to achieve

[6] Additionally, offenders in Criminal History Category I have a recidivism rate of 13.8%. *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 21-30. For those over age fifty at the time of sentencing, the rate in Category I is even lower at 6.2%. For all Category I defendants convicted of fraud, the recidivism rate is only 9.3%.

[7] There is no empirical evidence demonstrating a relationship between sentence length and general or specific deterrence, regardless of the crime. *See* Andrew Von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding correlations between sentence severity and crime rates are statistically insignificant). Moreover, the Sentencing Commission has found no correlation between recidivism and Guidelines' offense levels. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004). Instead, research demonstrates that "increases in severity of punishment do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Just. 1, 28-29 (2006) (emphasis added).

rehabilitation. Mr. Rogers is prepared to take full advantage of the treatment options available to him while incarcerated.

In light of the above, we respectfully submit that in the context of Mr. Rogers's family-and-community-oriented life, his advanced age, and his pre-indictment admission of wrongdoing, a sentence of 24 months incarceration will adequately recognize the seriousness of the offense, promote respect for the law, and provide deterrence and just punishment.

**D. A 24-Month Sentence Would Avoid Sentencing Disparity**

In its pleading, the government downplayed the significance of the criminal conduct in similar matters in seeking a disproportionate sentence for Mr. Rogers. Such a result, would be unjust. Counsel submits the examples below, supported by facts from the record, demonstrate that a sentence of 24 months is in alignment, on a national level, with other federal sentences that have been imposed in cases involving similar facts. ***See*** Press Releases attached as Exhibit 4.

*United States v. William Tierney,* 18-CR-804 (S.D.N.Y. ). Mr. Tierney pled guilty to a conspiracy to run scam PACs. Here are a number of facts that illustrate his conduct was more egregious than the situation at bar, according to the original criminal complaint filed in his case. Mr. Tierney received donations in excess of $23 million between 2014-2017. Of the $23 million raised from his 9 PACs, only $109,000 went to political candidates and $3 million was paid to Mr. Tierney. He concealed his identity and used fictitious names to solicit funds from donors. He claimed that money would go to autism awareness, law-enforcement appreciation and pro-life causes, although none did. He had a liquid net-worth of $8.5 million from operation of the scam PACS and used shell bank accounts to move money. He was ordered to serve 24 months in prison, pay restitution of $1,175,417.23 and forfeit $410,649.18.

*United States v. Kyle Prall*, 19-CR-13 (W.D. Texas). Mr. Prall was indicted on 24 counts of mail and wire fraud, money laundering, false statements and falsification of federal records. He raised $548,428 though Scam PACs, donated a mere $5,100 to campaigns but misappropriated $205,496 through sham corporations to enrich himself. He also used the PAC's credit card to pay for personal travel to Florida and Belize, to pay for food, hookah, alcohol and bottle service, "club dances performed by entertainers," room service, minibar charges, a deep tissue massage and a pet cleaning fee. Mr. Prall also used a pseudonym to report expenditures to the FEC. He was sentenced to 36 months of prison.

*United Sates v. Harold Russell Taub,* 19-CR-15 (R. I.). Tyler Russel Taub raised more than $1.6 million through Scam PACs and used more than 1 million of those funds personally. For example, he transferred $715,000 directly into his personal checking and savings account. He also withdrew $100,000 in cash from the bank. He used credit cards to pay an additional $217,000 in personal expenses, which included, cigars, clothes, airfare, strip club visits and escort services. To make matters worse, he claimed to be a former ambassador and repeatedly used a high-level military officer's name during the course of his scheme even after being told to not do so. Mr. Taub never registered his PACs with the Federal Election Commission and he never filed reports. He was sentenced to 36 months of incarceration.

The above-mentioned cases illustrate that a sentence of 24 months for Mr. Rogers, an individual with a Criminal History Score of I who has promptly accepted responsibility and made extraordinary restitution is consistent with other sentences that have been imposed in similar federal cases.

## **CONCLUSION**

Mr. Rogers sincerely regrets and takes full responsibility for his actions that have brought him before the Court.  Mr. Rogers asks the Court to fashion a sentence that will punish him but that will also recognize his otherwise meritorious life.  Mr. Rogers is hopeful that, after serving his sentence, he can return to the community, work industriously to re-establish himself as a productive contributing member of society, and put to good use everything he has learned about himself throughout this experience.  The many letters submitted to the Court illustrate Mr. Rogers' resilience and optimism, which is in accord with his attitude about life.

For the reasons set forth above, and any other reasons that may appear to the Court, we respectfully request that the Court impose a sentence of 24 months as it is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).


Date:  January 13, 2010          Respectfully submitted,


                                 KELLEY ROGERS,
                                 By Counsel,

                                 /s/ Stuart S. Sears
                                 Stuart A. Sears
                                 VA Bar #71436
                                 *Attorney for Kelley Rogers*
                                 Schertler & Onorato, LLP
                                 901 New York Avenue, N.W.
                                 Suite 500
                                 Washington, DC  20001
                                 Telephone:    (202) 628-4199
                                 Facsimile:    (202) 628-4177
                                 ssears@schertlerlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of January, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record involved in the case.

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar #
*Attorney for Kelley Rogers*
Schertler & Onorato, LLP
901 New York Avenue, N.W.
Suite 500
Washington, DC 20001
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ssears@schertlerlaw.com

