# EXHIBIT 1

# FEC Audit Hearing of September 14, 2017

Commissioners in attendance:
    Chairman Steven T. Walther (I)
    Vice Chair Caroline C. Hunter (R)
    Lee E. Goodman (R)
    Matthew S. Petersen (R)
    Ellen L. Weintraub (D)
    -- The sixth Commissioner seat is currently vacant

Auditors in attendance:
    Marty Favin, head of the Audit Division
    Bill Antosz, the lead auditor

***Chairman Walther:*** Good morning, everyone. This is the audit hearing for Freedom's Defense Fund and Conservative Majority Fund. The audit hearing will now come to order. The hearing will be conducted pursuant to procedural rules and audit hearings adopted by the Commission in 2009, which is available on the Commission website. Before us today is Scott Mackenzie, treasurer of both committees. It's nice to have you here. We appreciate your willingness to combine the audits to one hearing, that the factual legal issues appear to be similar.

As you may recall, on June 8, 2017, the Audit Division provided you with a copy of the draft final audit record for Freedom's Defense Fund as well as a copy of the relevant legal analysis. The report set forth four findings and recommendations. In your response dated June 26, 2017, you requested a hearing on behalf of Freedom's Defense Fund and the Commission granted that request.

On June 28th, 2017, the Audit Division sent a copy of the Draft Final Audit Report for Conservative Majority Fund and legal analysis. That report set forth five (5) findings and recommendations. In a letter dated July 14th, 2017, you requested a hearing on behalf of the Conservative Majority Fund and the Commission granted that request. Both requests state you wish to address the findings related to the report of apparent independent expenditures and for the Conservative Majority Fund the finding of misstatement of financial activity.

Mr. Mackenzie, for today's hearing you may make a brief opening statement. I'm going to depart a little bit. We've talked, and I talked to Audit. I think the procedure will be that Audit Division will give just a short overview, kind of orient the conversation to some degree and then feel free to engage us in any way you can and, again, thank you very much for being here today. Do you have someone here you would like to introduce sitting with you?

***Mackenzie:*** No, I'm alone. These are members of your staff.

***Chairman:*** You don't look that alone.   [chuckles]
All right. Audit will begin.

***Bill Antosz, Lead Auditor:*** Good morning, Mr. Chairman, and Commissioners. We're here today for the audit hearings on the Draft Final Audit Reports of the Audit Division on the Freedom's Defense Fund and the Conservative Majority Fund. And as you stated, the Draft Final Audit Report of Freedom's Defense contains four (4) findings, disclosure of occupation, name of employer, reporting of parent independent expenditures and record keeping for communications.

And the treasurer has requested a hearing to discuss finding #3, reporting of apparent independent expenditures [IEs]. And we're happy to provide an overview of the second audit at this time if you would like.

***Chairman:*** Sure, short and sweet, sure. Thanks.

***Antosz:*** For Conservative Majority Fund, there were five (5) findings in the Draft Final Audit Report. Misstatement of financial activity, disclosure of occupation, name of employer, reporting of apparent independent expenditures, reporting of debts and obligations, and record keeping for communications. And the treasurer requested the hearing today to discuss finding #1, misstatement of financial activity and finding #3, the reporting of apparent independent expenditures.

***Chairman:*** Okay. Thank you. Mr. Mackenzie, is there an order you would like to begin?

***Mackenzie:*** Yes.

***Chairman:*** Feel free to go for greatness.

***Mackenzie:*** Thank you. Good morning. My name as stated earlier is Scott Mackenzie, treasurer of both committees, Freedom's Defense Fund and Conservative Majority Fund and I appreciate having this opportunity to come before the commission and speak today. I've been involved since April of 1979 with the Commission filing FEC reports from that time forward. And this is my first time ever coming before a setting like this. So, again, thank you.

I first would like to say, although over the years I had many disagreements with the audit staff, I would like to say that -- and that goes back to auditors, such as Rick Halter, Tom Nurthan, Joe Stoltz, some of you may remember these people, and now to the present with Bill Antosz and Marty Favin, I would have to say that my relationship with auditors, has always been, I think a fairly pleasant one. I have always found them to be knowledgeable, professional, and tough, although I'd have to say, for the most part fair. And so it's not much more you can hope for when dealing with an audit team, and so thank you for your knowledge, your professionalism and your fairness.

Now, with Freedom's Defense Fund, I would like to talk about the reporting of independent expenditures. In the 2012 election cycle, the committee reported $386,000 in broadcast media and non-solicitation voter contact mail, and these were reported as independent expenditures. Through the audit, the auditors determined we should also have reported another $868,000 worth of independent expenditures that were related to our solicitation mailings. Now, I

understand that the definition of an independent expenditure is one that expressly advocates the election or defeat, of a clearly identified candidate without coordination with the candidate or the candidate's committee. But further in the regulations, it states that when you are reporting, your FEC disclosure reports that you have to provide a purpose for that expenditure, and the purpose in our case has always been that it was a solicitation mailing, and that's the type of expenditure we reported on Line 21B of our filings. And we had been doing that from the beginning of the – the inception of the committee, and that was from 2004 forward.

Now, with filing those types of expenditures, the solicitation mailings as 21B, operating expenditures, we did that, like I said, from the beginning, that was the precedent that we had set and in 2004 -- I'm sorry, in 2008, that cycle, we were audited by one of the FEC's top auditors, Tesfai Asmamaw; I probably butchered his last name, and I'm sorry if I have, but he is an extremely talented individual, certified in many areas. I know he's a CPA, a Certified Internal Auditor and he's got a number of other certifications. He audited us in 2008, for that cycle and did not identify any of our solicitation mailing expenses as being required to be filed on Line 24 as independent expenditures. My feeling is the precedent of filing solicitation mailings as Line 21B operating expenditures was kind of set in stone based on his Final Audit Report.

Now, the committee has taken a much tougher stance toward, you know, a stricter interpretation of independent expenditures and since 2012, so in the 2014 cycle forward we are aggressively reviewing all solicitation mailings and reporting those disbursements that clearly identify a candidate for election or defeat and we're reporting those as independent expenditures. But prior to that we were not. We were reporting them as operating expenditures, and I would think that most committees, with an audit report that says a committee failed to file $868,000 worth of independent expenditures might be subject to a fairly massive fine, and what I would like you to do is see that we were following precedent, precedent that was set in stone by an audit report, and that, you know, we can accept the fact that you -- we have a disagreement here, but we don't think it should be subject to a fine. That's all I have to say about Freedom's Defense Fund, if you have any questions or comments, I'm ready for them. If not, I'll move on to the Conservative Majority Fund.

***Commissioner Goodman:*** Hi Mr. Mackenzie, Lee Goodman, how are you? I understand your reliance argument, and that may or may not affect referrals and penalties, you know, based on a reliance argument or reliance on effectively the guidance you got from an audit in 2008 that would have led you to believe you were doing things properly in this category. But I guess I have a little bit of a broader question for you, and that has to do with the policy underlying this classification, and the first is -- I know you deal with a lot of organizations, so I'm sure you deal with some 501 (c), do you deal with 501 (c) organizations as well?

***Mackenzie:*** I really don't. No.

***Goodman:*** You just deal with PAC's and regulated political entities?

***Mackenzie:*** I've been involved with a couple of 527 organizations.

*Goodman:* I see. The reason I ask is because this has a bit of a broader implication for those types of organizations, because at the IRS, you know, on a 990, you have to distinguish between your mission expenditures and your solicitation expenditures.

*Mackenzie:* And that's what I was going to bring up with the Conservative Majority Fund, that very issue, of the 990s and how things are allocated, expenses are allocated with a 990 between Program, Management and Fundraising.

*Goodman:* I raise it because our definitions of IEs and what constitutes an IE doesn't line up perfectly with IRS classifications, but it seems to me that there is at least a principle that we draw upon or that we harmonize with the IRS, and that's this: A solicitation letter that is 90% text and advocacy, you would put as program expenses on your 990, and then if 10% of the solicitation is the ask for money and maybe an envelope for return, you would attribute about 10% to solicitation, because that's what most non-profits do, and I think most accountants advise non-profits, including 527 organizations that that's a reasonable accounting distinction. And I -- and the second observation I have is when I look at your total expenditures of 3-point -- was it 3.2 million?

*Mackenzie:* In that neighborhood, yes.

*Goodman:* And you show independent expenditures of 300 and what, 86 or $76,000?

*Mackenzie:* 386 [$386,000].

*Goodman:* There is some concern for groups about the percentage of the money that they raise, that they then spend on the missions to people, that they're going to advocate on behalf of candidates. Now, the way I see many of those solicitations is, they are 90% advocacy. In other words, the solicitation letter does engage in advocacy and fulfill the commitment to people that we are engaging in advocacy.

*Mackenzie:* I don't disagree with you at all. My point is simply that things were filed one way...

*Goodman:* Yes.

*Mackenzie:* ... and then audited and basically giving us a green light that we were doing it correctly, and now the rules have changed and -- which is fine, and we are -- we have adopted that new policy, but I just feel that to kind of change the rules in the middle of the game or after the game has ended, it puts the committee at a great disadvantage.

*Goodman:* Let me, Mr. Chairman, if I may...

*Chairman:* Yes.

*Goodman:* The reliance argument is, I think, separate from the substantive argument. So I take it that you don't take issue if the commission wants you to report this on line 24 versus 21 (b),

you're more concerned with the fact you thought you relied on guidance you received from a prior audit and you were continuing to conform your conduct and reporting to the guidance that you effectively got through an audit. And that is one of the purposes of audits

*Mackenzie:* Correct. And I always try to learn something from these audits, and that was an issue that, you know... had Tesfai [2008 Auditor] said -- and again, Tesfai is a brilliant guy. Any time I talked to him about an issue related to accounting, I felt like I was back in school, he was so knowledgeable, and had he said you really need to report these as independent expenditures, we would have adopted that policy immediately.

*Goodman:* Yes, can I just make inquiry of our general counsel or Audit Division of what vintage is this classification of solicitation letters as independent expenditures? I mean, I didn't understand this to be a new rule. I thought the classification went back many, many years.

*Mackenzie:* If I can make a statement...

*Goodman:* By the way, again, I'm not discounting your reliance argument, and the -- that's not the purpose of my inquiry.

*Mackenzie:* I don't think that legitimately there was a change, like the -- as far as I know, the regulations never changed, you know, we got the definition of what an independent expenditure is. I think the approach the auditors have taken is what has changed. You can correct me if I'm wrong, Marty or Bill [Audit staff].

*Goodman:* I'm seeking guidance here about the vintage of the rule. We didn't spring a new rule. Perhaps we didn't provide the guidance that he would have expected in 2008, but the rule itself, how -- how old is that classification?

*Marty Flavin:* I'm not exactly sure how old it is, but I agree with what Scott said that there's been no change in that.

*Goodman:* Okay. I just want to develop that point. The Commission hasn't changed the rule. The Commission always considered these IEs, the Commission just didn't apprise you of it when you dealt with the staff in 2008. I'm impressed with that argument, but that's a different phase of this than the finding itself.

*Mackenzie:* Sure.

*Chairman:* I wonder if at this point, you want to finish your comments on your presentation, because if we're going to -- if we're done with reliance, how do you feel about that?

*Goodman:* That's fine. I just wanted to go through this -- since this issue was on Freedom's Defense Fund and the issue – and the delta is $868,000, I wanted to crystallize what your position is.

*Mackenzie:* And my position is very simply that, as you said, the rules haven't changed, it's the application of the rules that has changed.

*Goodman:* Or at least alerting you to the application of those rules.

*Mackenzie:* Right. And so we just -- in the -- the issue of fairness, basically, would not want the Commission to look and say, hey, this is a committee that for whatever reason failed to file $868,000 worth of independent expenditures. That there is a reason behind that and, again, it's reliance on the fact that this was what was always done, and we had always thought we were doing it correctly, and the 2008 audit report kind of set in stone that it had been done correctly

*Goodman:* Of the 868, can you run me through the dates of those solicitations?

*Mackenzie:* Well, it would have been from the election cycle, that began in January of 2011 through December of 2012.

*Goodman:* Through December, okay.

*Vice Chair Hunter:* Thank you, I just wanted to see if the Audit Division has a reaction to Mr. Mackenzie's summary, that audit didn't point out in the past and it should have been reported a different way and he relied on that. Any response to that comment?

*Antosz:* Well, we have a basis to believe that in 2008 that the mailers were not reviewed, and here is why we believe so. The independent expenditure review board paper for 2008 only addresses the television ads, the 300 -- not the -- that's 2012 audit. I don't have the numbers in front of me. When we looked at the -- we went back after the fact and looked at the 2008 work papers. What was on there was just the television ads. There was no indication that the mailers were included in that review.

*Mackenzie:* If I can interrupt you for a second, I know that the mailers were provided and looked at. They may not have been looked at to determine what portion was to be considered independent expenditures, but they were reviewed.

*Antosz:* We found the mailers. They were in a folder that was marked "not used." So I wasn't involved in that audit of the assistant staff director and the audit manager that were involved are no longer here. And the lead auditor doesn't have a recollection.

*Vice Chair:* Thank you. Would Mr. Mackenzie have a way of knowing they weren't reviewed? Is that summarized in the audit report somewhere?

*Antosz:* The audit report addresses the findings we uncovered. It doesn't address all areas of review. We layout a scope at the beginning to say what is reviewed, but it's in general terms.

*Vice Chair:* Is it clear that the mailers were not reviewed?

*Antosz:* It's not clear, no. That's why we believe that they weren't reviewed, but we -- and I laid out why we think so.

*Vice Chair:* It's not clear in the audit report, in the Final Audit Report.

*Antosz:* No.

*Vice Chair:* Okay.

*Mackenzie:* I'll move on to Conservative Majority Fund. And, again, first let me say, item number one, misstatement of financial activity, we've decided we're going to remain silent on that issue and I'm not going to discuss that at this time. But with the other issue, the independent expenditures, it's somewhat similar to Freedom's Defense Fund but also different. We did file as independent expenditures some of those "fundraising" related costs and you might say, why would you do it with one and not the other? And there is a distinct difference. With Freedom's Defense Fund, the primary source of revenue generation was direct mail. With Conservative Majority Fund it was telemarketing, and one of the components of telemarketing -- I'll give you a quick explanation how that would work. We develop a list and have the telemarketing firm call people on the list and they get somebody on the line and say, we've got a one-minute -- a 60-second message we would like you to listen to, and that message would be a political message advocating the election or defeat of a candidate. So those portions were reported as independent expenditures, because the message was political. It didn't ask for fundraising or anything, and at the end it says, please stay on the line for one of my associates. That associate would come on the line and make the pitch to "help us raise money, so we can elect or defeat this individual."

And so, we were reporting portions of that -- of those sums as independent expenditures. But clearly there's a difference between how we were raising money through Conservative Majority Fund versus Freedom's Defense Fund. They did have the dual purpose. And so, we had reported $1,347,000 in independent expenditures and the auditors claimed we should have reported $1,816,000. I understand that number has been adjusted downward somewhat. But what I did after getting the report was I went back and took a hard look at all the invoices, all of the expenses that we incurred and came up with a number of $915,000. And I don't want to bore you by throwing numbers at you, because the numbers really are not the issue. The issue is allocation. And one of the things I did was look at a 2014 -- the October 2014 issue of a The Journal of Accountancy and they had an article there talking about how not-for-profits should allocate joint costs. And as Commissioner Goodman has said, these non-profits file 990s on an annual basis and are required to break out their expenditures between Program, Management and Fundraising.

And so, the article dealt with how they should be allocating their costs, and since it's a similar issue to political committees and PACs such as Conservative Majority Fund, this was an article of interest to me and one of the things I would like to do is read a paragraph from that article where it talks about what a committee should do in allocating their funds. It says:

> *To properly allocate joint costs, the allocation methodology used should be rational and systematic. It should result in an allocation of joint costs that is reasonable, and it should be applied consistently given similar facts and circumstances.*

Now, both the auditors and myself have spent a lot of time generating the numbers that we generated, and I've prepared and provided work papers when I responded to the interim audit report that clearly lays out how I came up to my figure of $915,000. I would attest that the numbers that I have provided -- that they may not agree with the auditors, but the methodology used is sound and in accordance with the AICA and therefore, again I'm contending that the fact we have a difference in the amount of money that was allocated as independent expenditures should not result in a fine because I believe we have acted in good faith and in accordance with the AICPA in this.

That's all I've got. Any questions or comments?

**Chairman:** Okay, thank you very much. Any further comments? Thank you, Mr. Goodman.

**Goodman:** Let me ask the audit staff, how do we allocate? And can you explain the difference in Mr. Mackenzie's allocation versus ours or did we not allocate at all? Is that really the difference of opinion?

**Antosz:** That's the main difference in our numbers. We looked at the solicitation as an independent expenditure. We didn't break down a portion of it as part solicitation or part fundraising, part IE. We considered it 100% IE.

**Goodman:** What number did we land at?

**Antosz:** Our new number is 1.6 million.

**Goodman:** And the committee reported 1,347,000?

**Antosz:** Originally, they reported 1,347,000 as Mr. Mackenzie stated. He's recalculated it to come down to 900,000 now.

**Goodman:** But the delta between what was reported and our catch-all category or definition, you know, all solicitation is included as an IE is about $250,000?

**Antosz:** 273.

**Mackenzie:** Commissioner, if I could make a comment. One of the differences between the way the auditors have approached this and the way the committee did -- we provided to donors who gave at a certain level things like there are premiums, one was an American flag. And I know the auditors included that as an independent expenditure, where we felt it was solely related to fundraising as if you were somebody who gave a $5 contribution, you were not entitled to the flag. I forget what the amount was. It might have been $100 or something like

that. So that's one of the differences, and there were many that I -- you know, you could see in the work papers that I had provided at the time of the interim audit report.

*Goodman:* Just to clarify, are you saying the cost of the flag is included in the 1.6 million?

*Mackenzie:* Yes, in their revised 1.6 million, the cost of the flag, but also the postage to send it as well.

*Goodman:* Yes, ma'am.

*Audit Staffer. unnamed:* Let me just answer that. That's part of reason our number adjusted down because originally, we did include the cost of the flag, but after further review we deducted that.

*Goodman:* Because it was separate mailing and didn't include advocacy?

*Audit Staffer:* Correct.

*Goodman:* And so, you adjusted down about $200,000 from the interim finding?

*Audit Staffer:* Yes.

*Goodman:* Okay. Any other discrepancy -- other than the allocation --

*Mackenzie:* Well, there were several, but that's one that I have at the top of my list. You know, again, initially I thought I would bring handouts going over all the numbers and I could blind you with, you know, all of the numbers that we've come up with, because I looked at every single invoice determining, you know, what should and should not be allocated.

Another big item, now that I think of it, though, is the length of the phone call -- most phone calls lasted about five minutes and we had determined that since we have the one-minute political advocacy and then the rest of the phone call, the other four minutes related to trying to get the individual to make a contribution that we had kind of a 20/80 percent ratio in the cost of those calls where 20% went to political or independent expenditures and the rest went to fundraising. That would be a huge difference.

*Goodman:* Okay. Thank you.

*Chairman:* Any further questions or comments? Mr. Mackenzie, anything further?

*Mackenzie:* Nothing further.

*Chairman:* Well, thank you very much.

*Mackenzie:* Thank you for the opportunity.

*Chairman:* Excuse me. Does somebody want to speak?

*Commissioner Petersen:* I just have -- on this issue of allocation, I just want to turn to the auditors for a moment. You mentioned that you look at a phone call or a mailer as the total cost of the communication that you didn't break it down. Is there any precedent within the Commission, where we've taken particular communications and broken down the cost further or do we usually say once the threshold of express advocacy is triggered, then we take the total cost of that communication and put it in the box of independent expenditure? This is the first time this issue has been raised?

*Antosz:* My understanding is that, that's how we've always approached it, if any part of it, is express advocacy, the whole thing is considered an independent expenditure.

*Petersen:* Okay. And then just to clarify something that -- when you were having your back-and-forth with Commissioner Goodman, the position isn't so much -- from what I understand, it isn't that you disagree with the conclusion of the auditors that certain of these solicitations should have been considered IEs, it's more of the notice issue?

*Mackenzie:* I'm taking the position that the committee has done what was reasonable and, you know, we can have differences over what is the actual number, but the main thing is, you know, we're talking about large discrepancies between what the Committee reported and what the auditors are saying, and again, I just don't think that the Committee should be fined as if they just decided, hey, we're not going to bother reporting those.

*Petersen:* When I was going through the audit report, when I was reading through your response, which was actually helpful to just further understand, you know, the lens through which you view these mailings, the difference between direct mail solicitation versus voter persuasion and how those categories are relevant in that realm, but don't necessarily line up with the categories that are relevant to us. We look to see whether or not there's express advocacy and whether or not the purpose behind a mailing might be solicitation versus persuasion. The categories that we look through aren't necessarily the categories that you apply, but from what I understand, the 2008 audit that you underwent didn't identify these things. You took from that, that you thought that gave a -- if not necessarily a stamp of approval, at least an indication there was no violation by reporting the way you would report it up to that point.

*Mackenzie:* Exactly.

*Petersen:* And so if we're going to do it a different way, then there should be some different consideration as to how we should treat that should this, you know, be referred to enforcement or so forth, that there is a notice issue, that you feel like you were not afforded.

*Mackenzie:* Yes.

*Petersen:* Okay. Thank you for clarifying that.

*Chairman:* I do see that you did mention in the discussion of the 2008 election cycle, as a question. If the audit staff determines the committee's direct mail program was properly reported on Schedule B, Line 21B, which I have memorized, of course, for the 2008 election cycle -- how is it that audit staff can claim that for the 2012 cycle, FDF should have reported 868,000 related to its direct mail program on Schedule B, Line 24 as independent expenditures? That was the point you're making then and now?

*Mackenzie:* Correct.

*Chairman:* Any further questions? Commissioner Peterson? Thank you very much. This is very helpful.

*Mackenzie:* Thank you for the opportunity and nice meeting you all.

*Chairman:* Take care. At this point if there's no further discussion, this part of the meeting is concluded.

### #